**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

MICHAEL EMERY BASHER,
            *Defendant-Appellant.*

No. 09-30311

D.C. No.
CR-08-2127-RWH

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Robert H. Whaley, District Judge, Presiding

Argued and Submitted
May 6, 2010—Seattle, Washington

Filed January 20, 2011

Before: Kim McLane Wardlaw and Ronald M. Gould,
Circuit Judges, and Richard Mills,* Senior District Judge.

Opinion by Judge Mills

*The Honorable Richard Mills, Senior United States District Judge for the Central District of Illinois, sitting by designation.

1149

## COUNSEL

James A. McDevitt, United States Attorney, Alexander C. Ekstrom (argued), Assistant United States Attorney, Yakima, Washington, for the plaintiff-appellee.

Diane E. Hehir, Assistant Federal Public Defender, Federal Defenders of Eastern Washington & Idaho, Yakima, Washington, for the defendant-appellant.

## OPINION

MILLS, Senior District Judge:

Michael E. Basher ("Basher") appeals the denial of his motion to suppress a firearm and statements made to police who arrested him after responding to reports of an illegal fire and discharge of a firearm on National Forest Service land. Basher entered a conditional guilty plea after the district court

denied his motion to suppress. Basher was convicted of being a prohibited person in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and for possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d).

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

**I.**

On the night of September 1, 2007, campers on National Forest Service land in Yakima County, Washington heard intermittent gunfire over the course of two hours coming from a "dispersed" or undeveloped campsite on the bank of the South Fork River. Campers also observed a campfire at the same location, although a burn ban was in effect. Among the campers who heard the gunfire were two off-duty law enforcement officers.

The topography surrounding the dispersed campsite, including a rock wall, caused an echo phenomenon that distorted the report of the firearm, so the officers could not tell what kind of weapon was being discharged. While the echo phenomenon distorted the report of the firearm, it did not seem to affect the campers' ability to locate the source of the firing. Campers and one of the officers identified the dispersed campsite as the source of the firing.

The two off-duty officers—Yakima County Sheriff's Deputy Dan Cypher[1] and Forest Service Officer Blair Bickel—checked into duty the following morning and each traveled toward the dispersed campsite to investigate. Officer Bickel arrived first and contacted Deputy Cypher by radio, informing him that he wished to investigate the occurrences at the camp-

---

[1]The Yakima County Sheriff's Department has a contract to provide law enforcement services to the United States Forest Service.

site. Deputy Cypher was en route, and arrived immediately after the radio communication.

Upon arriving, Deputy Cypher parked his vehicle nose to nose with Basher's truck. While Deputy Cypher later testified that this would block the vehicle's exit, Officer Bickel testified that there was sufficient room to drive around the police vehicle. Deputy Cypher emitted a few short bursts from his vehicle's siren.

Deputy Cypher noticed that the driver's side window of Basher's truck was rolled down, and that a box of shotgun shells was lying in plain view on the driver's seat. He also noted that the box was open and half-empty. Deputy Cypher pointed out the box of shotgun shells to Officer Bickel.

The officers also observed the fire ring as they approached the tent. Officer Cypher testified that in addition to the rocks typically placed around the edge of a fire ring, this fire ring had additional rocks stacked on top, creating a cone of rocks that could inhibit observation of the fire. Deputy Cypher testified that he saw smoke rising from the fire ring, and that the contents appeared to be smoldering. Officer Bickel remembered seeing ashes that were consistent with a recent fire, but could not recall seeing smoke.

From their position, the officers were facing the rear of the tent. Upon drawing closer to the tent, Deputy Cypher announced "Sheriff's Office" after noticing that the occupants were moving within the tent. The occupants were asked to exit the tent, and they came out of their own volition.

As the individuals exited the tent, Deputy Cypher told them to keep their hands in view. Deputy Cypher could not recall his exact words, and Officer Bickel could only recall that the word "hands" was used. The officers did not have their weapons drawn or yell at Basher or his son. There was no testimony that Basher and his son were ordered out of the tent.

The officers guided Basher away from the tent, slightly separating him from his son. The officers engaged in small talk with them, and Basher lit a cigarette. No one was placed in handcuffs or frisked.

Deputy Cypher then asked Basher where the gun was. Basher responded "What gun?" Deputy Cypher told Basher that he had seen the shotgun shells and explained there were reports of gunfire coming from the campsite. Basher responded that the gun was in the tent.

Deputy Cypher asked if Basher's son could retrieve the weapon from the tent. Basher looked at his son and nodded affirmatively for him to retrieve the gun. Deputy Cypher gave the son instructions on how to safely retrieve the weapon. The officers did not enter the tent at any point.

The son went into the tent, and came out with a sawed-off shotgun. Deputy Cypher testified that he immediately recognized that the shotgun was of an illegal length, and arrested Basher. Deputy Cypher read Basher his *Miranda* rights, and Basher waived his rights. Basher subsequently made inculpatory statements. Upon running Basher's name through a database, Deputy Cypher discovered that Basher had an outstanding warrant from Lewis County. Basher was subsequently transported to jail. Ultimately, Basher was not formally charged with violating provisions in the Code of Federal Regulations ("C.F.R.") regarding the illegal campfire or the firing of the weapon, nor was he charged for analogous state crimes.

On November 13, 2008, Basher was indicted and charged with being a prohibited person in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d). Basher filed his motion to suppress on February 27, 2009, and a hearing was held on March 11, 2009. Neither Basher nor his son testified at the suppression hearing.

The district court denied the motion to suppress, following testimony and argument by counsel. The district court made the following factual findings: (1) both officers were aware that gunshots had been fired; (2) Deputy Cypher believed the firing came from the dispersed campsite and Officer Bickel did not know where the firing originated; and (3) Officer Bickel was able to determine from witness statements that the firing came from the dispersed campsite, and that there was an illegal fire at that location.

The district court ruled that the officers' conduct was lawful under *Terry v. Ohio*, 392 U.S. 1 (1968). The district court held alternatively that there was probable cause to arrest Basher for illegal discharge of a weapon and for violating the burn ban, and that in any event, the questioning regarding the gun falls under the public safety exception.

Basher entered a conditional guilty plea on April 24, 2009, and he was sentenced to a term of 15 months on August 4, 2009. Basher filed his Notice of Appeal on August 20, 2009. According to the Bureau of Prisons ("BOP") Inmate Locator Service, Basher was released from custody on February 12, 2010.[2]

## II.

## A.

" 'We review *de novo* motions to suppress, and any factual findings made at the suppression hearing for clear error.' " *United States v. Ruckes*, 586 F.3d 713, 716 (9th Cir. 2009) (quoting *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1282 (9th Cir. 1992)).

---

[2]*See* Inmate Locator, http://www.bop.gov/iloc2/LocateInmate.jsp (last visited Dec. 4, 2010). We take judicial notice of this information that is available to the public. *See Demis v. Sniezek*, 558 F.3d 508, 513 n.2 (6th Cir. 2009); *see also United States v. Montgomery*, 550 F.3d 1229, 1231 n.1 (10th Cir. 2008).

## B.

**[1]** The officers' interaction with Basher was a valid *Terry* encounter. An investigatory stop or encounter does not violate the Fourth Amendment if the officers have "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

In deciding whether a stop was supported by reasonable suspicion, the court must consider whether "in light of the totality of the circumstances, the officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007) (internal quotation marks and citation omitted).

**[2]** Deputy Cypher and Officer Bickel had well-founded suspicions of criminal activity originating in Basher's camp. The record indicates, and the district court found, that Deputy Cypher determined that the firing originated from Basher's dispersed campsite. Although Officer Bickel did not know initially where the firing came from, he was able to interview witnesses and determine that the firing came from the Basher's dispersed campsite. The witness reports received in person by the officers appear to have been credible, and provided a legitimate basis for investigating, although the officers did not write down the witnesses' names. *See United States v. Palos-Marquez*, 591 F.3d 1272, 1275-77 (9th Cir. 2010) (holding that an in-person tip can be sufficiently reliable to justify an investigatory stop).

Basher has attempted to portray the officers as merely acting upon a hunch. However, it appears from the record that there were specific and articulable facts that led each officer to believe that the shooting and campfire should be investigated. It is noteworthy that it appears from the record that each officer decided independently to pursue this matter.

Basher has argued that by the time the officers arrived at the dispersed campsite there was no longer a reason to investigate under *Terry* because the illegal acts had ceased. However, it was reasonable to believe that the activities would recur. When dealing with illegal sporadic gunfire, there is no guarantee that the culprits will refrain from firing again in the future. The same can be said for the use of an illegal campfire during a burn ban. Therefore, the officers could have reasonably assumed that the firing could resume sometime in the near term.

Basher states that Deputy Cypher had no reason under *Terry* to ask about a firearm after Basher and his son exited the tent, because they were unarmed and the weapon was in the tent. Although *Terry* often comes up in the context of officer safety, the whole purpose of a *Terry* encounter is to investigate suspected criminal activity. *See Terry*, 392 U.S. at 22. The officers were justified asking about the gun because it was within the scope of the investigation and to ensure officer safety.

**[3]** Here, the officers were investigating a gun crime and an illegal campfire. When police officers investigate gun crimes, it is routine to ask questions about guns. It is reasonable for officers investigating a gun crime to determine whether a firearm is present, and what kind of firearm it is. Therefore, the questions regarding the gun were within the scope of the *Terry* encounter.[3]

---

[3]If the officers had asked questions about something other than a gun, it would not have necessarily created a seizure under the Fourth Amendment. In the context of a *Terry* stop, a person's Fourth Amendment rights are not violated by the asking of questions, as long as the seizure itself is lawful under *Terry* and the encounter is not prolonged by the questioning. *See United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007) (" '[M]ere police questioning does not constitute a seizure' unless it prolongs the detention of the individual, and, thus, no reasonable suspicion is required to justify questioning that does not prolong the stop." (quoting *Muehler v. Mena*, 544 U.S. 93, 101 (2005))); *cf. Illinois v. Caballes*, 543

## C.

**[4]** The parties dispute whether *Miranda* applies. Officers are required to inform suspects of their Fifth Amendment rights before custodial interrogations. *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). The standard for determining whether police questioning rises to the level of a custodial interrogation is detailed below:

> *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." The "ultimate inquiry" underlying the question of custody is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. To answer this question, the reviewing court looks to the totality of the circumstances that might affect how a reasonable person in that position would perceive his or her freedom to leave.

*Stanley v. Schriro*, 598 F.3d 612, 618 (9th Cir. 2010) (internal quotation marks, alterations, and citations omitted).

**[5]** In this case, there was no display of weapons by the officers, no use of physical force, and it does not appear there was threatening language. Immediately before the questions about the firearm, Deputy Cypher and Basher were making small talk and Basher lit a cigarette. It does not appear that Basher's movements were significantly curtailed.

**[6]** Basher argues that he and his son were seized while inside the tent because of the officers' show of force. Basher's

U.S. 405, 407-08 (2005) (holding that a dog sniff carried out during a traffic stop, when there is no reasonable suspicion of drug activity, does not violate the Fourth Amendment as long as the duration of the stop was not extended by the dog sniff).

assertion that the officers presented an overwhelming show of force is unpersuasive. Deputy Cypher merely alerted Basher and his son to the officers' presence by briefly sounding the siren and announcing "Sheriff's Department." Furthermore, Basher's emphasis on the "hands" comment is unfounded. Police officers routinely ask individuals to keep their hands in sight for officer protection, and in this case the request does not appear to have been made in a threatening manner. Although Basher argues that his truck was blocked in, the testimony on that issue was contradictory, with Officer Bickel testifying that there was room to drive away.

Basher further argues that he was under duress because under Forest Service regulations, campers and hikers are prohibited from interfering with the law enforcement activities of the officers, and that campers must respond to law enforcement contact. *See* 36 C.F.R. § 261.3.

This argument is without merit. First, it is unclear that this issue was properly presented to the district court.[4] Second, Basher adduces no evidence that his cooperation was motivated by a desire to comply with an obscure regulation. Third, the regulation does not trump a person's Fifth Amendment right against self-incrimination. Thus, cooperation out of fear of violating the regulation would be unreasonable.

**[7]** In any event, it appears that the public safety exception applies to the questioning. An officer's questioning of a suspect without a *Miranda* warning is proper if the questioning is related to "an objectively reasonable need to protect the police or the public from any immediate danger associated

---

[4]When Basher mentioned the regulation in general terms at the hearing, the district court requested the citation or the text of the regulation. Basher initially provided the district court the citation of a nonexistent regulation and later apologized being unable to provide a citation. The district court noted, "if it has some relevance that I have to rule on it, I'd like to see it. But other than that I don't know—I mean you haven't argued it."

with the weapon." *New York v. Quarles*, 467 U.S. 649, 659 n.8 (1984) (holding that similar facts established only a *Terry* stop). An officer's subjective motivation is not relevant in analyzing whether questioning falls within the public safety exception. *Id.* at 656.

**[8]** In this case, Basher had not been searched or handcuffed, and he could have retrieved a weapon. *See United States v. Reilly*, 224 F.3d 986, 993 (9th Cir. 2000). The officers had reliable information that there was at least one gun in the camp, and there was an objectively reasonable need to find out where it was located. Basher has argued that there was no reason to ask about the gun because Basher and his son were unarmed at the time the question was asked. However, it is not clear that the officers knew that Basher was unarmed when they asked him where the gun was located. *See Allen v. Roe*, 305 F.3d 1046, 1050-51 (9th Cir. 2002) ("[T]he gun's actual location is irrelevant because the 'objectively reasonable need' for protection is based on what the officers knew at the time of the questioning.").

## D.

**[9]** The district court found that the retrieval of the weapon was voluntary, but it did not make a specific finding of fact on Basher's consent to the retrieval. The Fourth Amendment provides that people are protected from warrantless searches and seizures. Consent can be inferred from nonverbal actions, but it must be "unequivocal and specific" and "freely and intelligently given." *United States v. Chan-Jimenez*, 125 F.3d 1324, 1328 (9th Cir. 1997) (quoting *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990)). We have held that people can have a reasonable expectation of privacy in a tent pitched on public land. *See United States v. Gooch*, 6 F.3d 673, 677 (9th Cir. 1993).

The testimony indicates that Deputy Cypher asked for Basher's consent. It is undisputed that Basher affirmatively

nodded his head regarding the retrieval of the shotgun. Basher's attorney did not cross-examine Deputy Cypher on this point.[5]

[10] From the record, the head nod did not seem to be ambiguous, and head nods have been found to express consent. *See, e.g., United States v. Yockey*, 654 F. Supp. 2d 945, 954 (N. D. Iowa 2009). The consent in this case seems to be specific—clearly defining who would enter the tent (his son) and the scope of the activity (bringing the gun outside).[6]

The totality of the circumstances determine whether consent was "freely and intelligently given." *United States v. Reid*, 226 F.3d 1020, 1026 (9th Cir. 2000). We look to five factors in determining voluntariness: "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that [he] had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004). We noted that "[i]t is not necessary to check off all five factors, but many of this court's decisions upholding consent as voluntary are supported by at least several factors." *Id.* (internal quotation marks and citation omitted).

[11] In this case, the defendant was not in custody and the officers did not have their guns drawn. In addition, the officers did not tell Basher that a search warrant could be obtained if he refused to consent. On the other hand, Basher

---

[5]Counsel did ask about the instructions relating to the son, but did not elicit testimony clarifying the interaction regarding consent to search. Instead, counsel only elicited testimony from Deputy Cypher about his instructions to the son on how to unload the weapon.

[6]Basher argues that one cannot give consent during a *Terry* encounter, claiming that police-citizen interactions are either wholly consensual or completely involuntary. This argument is without merit. *See United States v. Meza-Corrales*, 183 F.3d 1116, 1125 (9th Cir. 1999).

had not been told he could refuse consent. As indicated above, we hold that Basher was not in custody, so the fact that no *Miranda* warnings were given is inapposite. Considering the totality of the circumstances, it appears that no Fourth Amendment violation occurred in connection to the retrieval of the weapon.

### E.

Basher has made several arguments regarding the warrant requirement, and has drawn our attention to *United States v. Struckman*, 603 F.3d 731 (9th Cir. 2010). In that case, a neighbor saw Struckman toss a backpack over the fence of an unoccupied home, and then saw him climb over the fence into the backyard. *Id.* at 736. After a 911 call, police arrived and confronted Struckman, who was acting erratically because he was high on methamphetamine. *Id.* at 736-37. During a pat-down search, police officers found a handgun magazine in Struckman's pocket and later located the handgun in the backpack. *Id.* at 737. After questioning Struckman, the police learned that he resided at the home. *Id.*

We reversed Struckman's conviction of being a felon in possession of a firearm, in part, because we held that the backyard of a home is curtilage, subject to Fourth Amendment protections. *Id.* at 739. We also held that the *Terry* exception to the warrant requirement does not apply in homes. *Id.* at 738.

As mentioned above, Basher claims that he and his son were seized while in their tent, because of the officers' display of authority. As we have detailed, the officers merely announced their presence, and the district court held that Basher and his son exited the tent of their own volition. The district court's finding does not appear to be clearly erroneous, and therefore we will not disturb it. *See Ruckes*, 586 F.3d at 716.

**[12]** Basher's seizure claim is distinguishable from *Struckman* because police officers entered Struckman's backyard, while here the Bashers left voluntarily. Because the Bashers left the tent voluntarily, the seizure argument necessarily fails. *See United States v. Crapser*, 472 F.3d 1141, 1145-46 (9th Cir. 2007).

**[13]** In addition, Basher has referred to the warrantless entry or search of the camp by the officers. Under *Gooch*, officers cannot enter a tent without a warrant, but that case did not address whether a campsite is also protected by the warrant requirement. *See Gooch*, 6 F.3d at 677; *see also Float-Rite Park, Inc. v. Vill. of Somerset*, 629 N.W.2d 818, 824 n.2 (Wis. Ct. App. 2001) (examining *Gooch* and rejecting argument that expectation of privacy extends to campground).

**[14]** Classifying the area outside of a tent in a National Park or National Forest lands campsite as curtilage would be very problematic. A tent is comparable to a house, apartment, or hotel room because it is a private area where people sleep and change clothing. *See Gooch*, 6 F.3d at 677. However, campsites, such as the dispersed, ill-defined site here, are open to the public and exposed.

In *United States v. Dunn*, 480 U.S. 294 (1987), the Supreme Court found that curtilage is defined by reference to four factors: proximity of the area to the home, the nature of the uses to which the area is put, whether the area is included in an enclosure around the home, and the steps taken by the resident to protect the area from observation. *Id.* at 301. While these factors can be employed with reasonable certainty in the urban residential environment, the analysis does not necessarily carry over to most camping contexts. Parkland campsites often have layouts that are vague or dispersed, and individuals often camp in areas that are not predetermined campsites.

**[15]** In the case at bar, Basher was staying in a dispersed, or undeveloped camping area. It appears that Basher's camp

was visible from the developed camping area where the officers had stayed the previous night. Therefore, we hold that there was no expectation of privacy in the campsite, and that the area outside of the tent in these circumstances is not curtilage. Accordingly, *Struckman* does not control the outcome of this case.

## III.

In summary, we hold that the officers' interaction with Basher constituted a valid *Terry* encounter, and that Basher's Fifth Amendment rights were not violated.

We further hold that Basher's Fourth Amendment rights were not violated, and that he consented to the retrieval of the shotgun from the tent.

[16] Finally, we hold that the area of a campsite outside of a tent in these circumstances is not curtilage.

Accordingly, the district court properly denied Basher's Motion to Suppress.

**AFFIRMED.**