**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 41241**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | 2014 Opinion No. 82 |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: October 8, 2014 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| RICHARD L. BECK, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Boise County. Hon. Kathryn A. Sticklen, District Judge. Hon. Roger Cockerille, Magistrate.

Order of the district court affirming the magistrate's order denying motion to suppress, <u>affirmed</u>.

David J. Smethers, Boise County Public Defender, Boise, for appellant. David J. Smethers argued.

Hon. Lawrence G. Wasden, Attorney General; Jessica M. Lorello, Deputy Attorney General, Boise, for respondent. Jessica M. Lorello argued.

_____

GRATTON, Judge

Richard L. Beck appeals from the district court's intermediate appellate decision affirming the judgment entered upon Beck's conditional guilty plea to possession of paraphernalia. Specifically, Beck challenges the denial of his motion to suppress. We affirm.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

A sheriff's deputy and Army Corps of Engineers' ranger responded to a report of a camper smoking marijuana at Macks Creek Campground near Lucky Peak Reservoir. Both the deputy and ranger were armed and in uniform. Passing through several other camping areas, they walked down a marked trail to Beck's campsite. The campsite was within a camping area designated by the Army Corps of Engineers.

1

The door on Beck's tent was wide open, and the tent was nearly falling over. The deputy observed Beck and his girlfriend sleeping in the tent. The deputy discovered a beer can while walking near the tent. The beer can was located to the side or rear of Beck's tent and near a tree, which was approximately six to seven feet from the trail. The beer can was smashed, contained several puncture holes, and had a burnt residue on it and what appeared to be a marijuana stem. Upon picking up the beer can, the deputy could smell the odor of burnt marijuana.

The deputy called to Beck and his girlfriend to wake up. Beck's girlfriend awoke, and after she was prompted by the deputy, she roused Beck. The deputy was familiar with Beck because he had talked to Beck about marijuana use the previous night. The deputy directed Beck to exit the tent and, after Beck became belligerent, instructed Beck to sit in a camping chair at the front of the tent for officer safety. The ranger described Beck as being very upset at being awoken and at the deputy for returning after speaking with him the night before. Beck's emotions were described as going back and forth from laughter to shouting, then back to friendliness. The ranger testified that from his training and experience, he believed Beck was intoxicated. Without providing *Miranda*[1] warnings, the deputy began to question Beck about the beer can. The deputy recounted their previous discussion, and asked if Beck knew about the beer can. Beck denied possession or knowledge of the beer can several times. He gave differing accounts regarding the presence of the beer can, including that some friends left it after smoking marijuana from it the night before. Beck ultimately admitted to smoking marijuana from the beer can, explaining he used it to "wake and bake." The ranger explained the term means that an individual smokes marijuana upon waking up.

The State charged Beck with possession of drug paraphernalia. Beck filed a motion to suppress evidence of the paraphernalia and the statements made before he was given *Miranda* warnings. The magistrate denied the motion. Beck entered a conditional guilty plea, reserving the right to appeal the court's denial of his motion to suppress. Beck appealed to the district court. The district court, sitting in its intermediate appellate capacity, affirmed the magistrate's decision. Beck timely appeals.

---

[1]    *See Miranda v. Arizona*, 384 U.S. 436 (1966).

## II.

## ANALYSIS

When reviewing the decision of a district court sitting in its appellate capacity, our standard of review is the same as expressed by the Idaho Supreme Court:

> The Supreme Court reviews the trial court (magistrate) record to determine whether there is substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings. If those findings are so supported and the conclusions follow therefrom and if the district court affirmed the magistrate's decision, we affirm the district court's decision as a matter of procedure.

*Pelayo v. Pelayo*, 154 Idaho 855, 858-59, 303 P.3d 214, 217-18 (2013) (quoting *Bailey v. Bailey*, 153 Idaho 526, 529, 284 P.3d 970, 973 (2012)). Thus, the appellate courts do not review the decision of the magistrate court. *Bailey*, 153 Idaho at 529, 284 P.3d at 973. Rather, we are procedurally bound to affirm or reverse the decisions of the district court. *State v. Korn*, 148 Idaho 413, 415 n.1, 224 P.3d 480, 482 n.1 (2009).

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999). In this case, the magistrate did not make explicit findings of fact when ruling on the motion to suppress. "When no such findings are made on the record, we examine the record to determine the implicit findings that underlie the trial court's determination and uphold those implicit findings if they are supported by substantial evidence." *State v. Bowman*, 124 Idaho 936, 940, 866 P.2d 193, 197 (Ct. App. 1993).

### A.     Fourth Amendment

Beck argues that the deputy's entrance into the area near his tent was unlawful under the Fourth Amendment. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. In order to rely on the amendment's protection, a defendant must establish

that a Fourth Amendment search occurred. *Kyllo v. United States*, 533 U.S. 27, 31 (2001) ("the antecedent question [is] whether or not a Fourth Amendment 'search' has occurred"). While Beck argues that he had a reasonable expectation of privacy in the area surrounding his tent, including where the can was found, his principal argument centers upon whether that area was part of the curtilage of his tent and, therefore, protected from intrusion.

In *Oliver v. United States*, 466 U.S. 170, 180 (1984), the Court described "curtilage" as "the land immediately surrounding and associated with the home." The Court further explained that, "At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' and therefore has been considered part of home itself for Fourth Amendment purposes." *Id.* (citation omitted). In *United States v. Dunn*, 480 U.S. 294 (1987), the United States Supreme Court established four factors to determine whether an area surrounding a home comes within the definition of curtilage for Fourth Amendment purposes. These factors are: (1) the proximity to the home of the area claimed to be curtilage; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from the observation of people passing by. *Id.* at 301; *see also State v. Webb*, 130 Idaho 462, 465-66, 943 P.2d 52, 55-56 (1997). The Court clarified that it was not creating a "finely tuned formula," but instead explained the factors are "useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration--whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301.

The magistrate, district court, and the State principally focus the analysis upon whether Beck had "a reasonable expectation of privacy" in the area surrounding his tent, as opposed to specifically whether the area was curtilage. In *Katz v. United States*, 389 U.S. 347, 351 (1967), the Supreme Court held that an individual within a phone booth had a reasonable expectation of privacy from outside listening devices, the Court explained that "the Fourth Amendment protects people, not places." The protection of people does not turn on the entry or intrusion of an area, but instead depends on the reasonable expectation of privacy that the individual possesses. Determining whether this interest exists "involves a two-part inquiry: (1) Did the person have a subjective expectation of privacy in the object of the challenged search? and (2) Is society willing to recognize that expectation as reasonable?" *State v. Pruss*, 145 Idaho 623, 626, 181

4

P.3d 1231, 1234 (2008). The first inquiry is a factual issue, and the second is an issue of law. *Id.*

The magistrate did not expressly analyze the *Dunn* curtilage factors. Instead, the magistrate concluded Beck did not have a reasonable expectation of privacy, and that the area around Beck's tent was within the open fields doctrine and, thus, inferentially found the area was not part of the curtilage. In *Hester v. United States*, 265 U.S. 57, 59 (1924), the United States Supreme Court explained "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields." In *Oliver*, the Court contrasted "open fields" to the curtilage and held that, "no expectation of privacy legitimately attaches to open fields." *Oliver*, 466 U.S. at 180. Here, the magistrate determined that anyone could have walked up to Beck's tent, it was on public land, and there was nothing indicating the area was private. The magistrate also relied on language in *Pruss* that indicated the area around the campsite in that case fell under the open fields doctrine. The district court, sitting in its appellate capacity, affirmed the magistrate agreeing with this analysis. The State likewise argues that *Pruss* is dispositive.

In *Pruss*, the Idaho Supreme Court considered whether Pruss had a reasonable expectation of privacy within a temporary "hooch"[2] that he had constructed on public lands. After Pruss was arrested, the officers searched the hooch without first obtaining a warrant. The Court held "that a person using a temporary shelter on public lands as his or her living quarters has a reasonable expectation of privacy in that shelter and that the government may not intrude into the shelter without a search warrant, absent an exception to the warrant requirement." *Pruss*, 145 Idaho at 627, 181 P.3d at 1235 (footnote omitted). The Court concluded that applying *Katz*, "[o]ne can certainly infer that a person has a subjective expectation of privacy in his dwelling, even if it is a temporary structure like a tent, travel trailer, or the hooch in this case." *Id.* at 626, 181 P.3d at 1234. The Court then concluded that the expectation of privacy

---

[2]     [A] frame structure camouflaged with tree branches that was about six feet square and three to five feet high. The frame was made of sections of limbs or small trees that were lashed together. The frame was covered by a plastic blue tarp, which was then covered by the tree boughs. A backpacking tent was erected inside the wooden frame, which extended a few feet beyond the front of the tent to form a small vestibule.

*State v. Pruss*, 145 Idaho 623, 625, 181 P.3d 1231, 1233 (2008).

within the enclosure was one that society was willing to recognize as reasonable. *Id*. Thus, the Supreme Court concluded that a reasonable privacy expectation existed within the enclosure. However, the Court further stated:

> Although the State is correct that Pruss did not have a reasonable expectation of privacy in the forest land surrounding his campsite, the interior of Pruss's hooch was not an open field. Police officers acting without a warrant are entitled to the same intrusion as a reasonably respectful citizen. *State v. Christensen*, 131 Idaho 143, 147, 953 P.2d 583, 587 (1998). A reasonably respectful citizen would not make an uninvited entry into another's tent pitched on public lands. Although the police could certainly have walked up to Pruss's hooch and while doing so could have lawfully observed anything in plain view, the open fields doctrine would not justify their entry into the hooch.

*Pruss*, 145 Idaho at 628, 181 P.3d at 1236. The courts below and the State rely largely on the language above, distinguishing between the interior of Pruss's hooch and the public land surrounding it. Beck does not distinguish *Pruss*. Instead, as noted, Beck attempts to focus the analysis on whether some area surrounding the tent should be considered curtilage, even though further out from the tent may be open fields.

In *United States v. Basher*, 629 F.3d 1161 (9th Cir. 2011), the Ninth Circuit Court analyzed questions regarding the existence of curtilage incident to a campsite and reasonable expectation of privacy. The officers arrived at the tent and verbally asked the defendant and his son to exit the tent. The officers did not enter the tent. In rejecting Basher's argument that the seizure occurred inside the curtilage of the campsite, the Ninth Circuit explained "[c]lassifying the area outside of a tent in a National Park or National Forest lands campsite as curtilage would be very problematic." *Id.* at 1169. Unlike traditional homes, a tent located within a dispersed campsite is open to the public and exposed. *Id.* Further, "[w]hile [the *Dunn*] factors can be employed with reasonable certainty in the urban residential environment, the analysis does not necessarily carry over to most camping contexts. Parkland campsites often have layouts that are vague or dispersed, and individuals often camp in areas that are not predetermined campsites." *Id.* The Court ultimately concluded:

> In the case at bar, Basher was staying in a dispersed, or undeveloped camping area. It appears that Basher's camp was visible from the developed camping area where the officers had stayed the previous night. Therefore, we hold that there was no expectation of privacy in the campsite, and that the area outside of the tent in these circumstances is not curtilage.

*Id.*

6

We agree with the *Basher* Court's analysis. Beck, however, argues *Basher* is distinguishable because individual campsites in this case were discernable from other campsites. The deputy testified that one could differentiate between individual campsites. However, the ranger testified that the campsites were not defined campsites. The ranger specifically testified that "on the downstream side of Macks Creek, we have three reserve-able campsites that are defined. Beyond that it's all open camping, and people camp very close to each other, people basically just move in and camp wherever they feel." We do not read in *Basher* that the dispersed or undeveloped nature of the campsites referenced was the underpinning of its analysis. Nonetheless, here, the magistrate noted that "anybody could pass through that camp; anybody could be headed to the boat dock. It's not private, it's just not private." Contrary to identifying a defined area, the magistrate viewed the campsite as open field. Therefore, we hold that there was no expectation of privacy in the campsite, and that the area outside of the tent in these circumstances is not curtilage.[3]

## B.     *Miranda* Warnings

Beck argues his statements should be suppressed because the deputy did not inform him of his *Miranda* rights before questioning him about the paraphernalia. The requirement for *Miranda* warnings is triggered by custodial interrogation. *State v. Medrano*, 123 Idaho 114, 117, 844 P.2d 1364, 1367 (Ct. App. 1992). The State does not dispute that the questioning constituted interrogation; thus, the only relevant inquiry is whether Beck was in custody when he made the pre-*Miranda* statements. The United States Supreme Court equated custody with a person being deprived of his or her freedom by the authorities in any significant way. *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). This test has evolved to define custody as a situation where a person's freedom of action is curtailed to a degree associated with formal arrest. *Berkemer v. McCarty*,

---

[3]     Even if we were to attempt to apply the *Dunn* factors in this case, they weigh against Beck's contention, with only one factor, proximity to the tent, weighing in his favor. There was no enclosure surrounding the tent, and Beck did not take any steps to protect the area from observation from those passing. Even assuming the record supports Beck's contention that the beer can had been hidden from view from the main trail, nothing prevented other campers from viewing that area from the surrounding forest. As the magistrate explained, the nature of this area was not private. This is evident given that the deputy and ranger could see Beck and his girlfriend sleeping in the tent from the main trail. Beck contends that his use of the area for gear storage and camping activities is sufficient to establish the area as curtilage. His contention ignores that the area is a public campground and the magistrate's finding that any other camper could use this area as a thoroughfare.

468 U.S. 420, 440 (1984); *State v. Myers*, 118 Idaho 608, 610, 798 P.2d 453, 455 (Ct. App. 1990). The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. *Stansbury v. California*, 511 U.S. 318, 323 (1994). To determine if a suspect is in custody, the only relevant inquiry is how a reasonable person in the suspect's position would have understood his or her situation. *Berkemer*, 468 U.S. at 442; *Myers*, 118 Idaho at 611, 798 P.2d at 456.

A court must consider all of the circumstances surrounding the interrogation. *Stansbury*, 511 U.S. at 322; *State v. James*, 148 Idaho 574, 577, 225 P.3d 1169, 1172 (2010). Factors to be considered may include the degree of restraint on the person's freedom of movement (including whether the person is placed in handcuffs), whether the subject is informed that the detention is more than temporary, the location and visibility of the interrogation, whether other individuals were present, the number of questions asked, the duration of the interrogation or detention, the time of the interrogation, the number of officers present, the number of officers involved in the interrogation, the conduct of the officers, and the nature and manner of the questioning. *See Berkemer*, 468 U.S. at 441-42; *James*, 148 Idaho at 577-78, 225 P.3d at 1172-73. The burden of showing custody rests on the defendant seeking to exclude evidence based on a failure to administer *Miranda* warnings. *James*, 148 Idaho at 577, 225 P.3d at 1172.

Beck argues that he was in custody based on the deputy and ranger ordering him out of the tent, into a camping chair, and repeatedly asking him if the beer can was his.[4] The State argues that the evidence established that Beck was not in custody. We agree. Beck was questioned in front of his tent in a public campsite, as opposed to a police station. The interrogation was made in the presence of his girlfriend, and there is no indication that the deputy or ranger used overly-coercive interrogation tactics. The deputy's inquiry into the beer can, at a public campsite while Beck sat in his own camping chair, does not equate to curtailment of

---

[4] Beck also argues that the magistrate and district court ignored his signed affidavit that established he was in custody. However, even assuming the affidavit was properly-admitted evidence, Beck's affidavit does not contradict the testimony of the deputy and ranger, and it does not mention whether Beck was ordered out of the tent, ordered into the chair, or to what degree he was questioned. More importantly, the magistrate expressly indicated that the affidavit was reviewed: "I was just perusing the affidavit, if you'll give me a chance. I'm looking at the affidavit filed on August 28th, 2011."

freedom associated with formal arrest. The district court correctly affirmed the magistrate's finding that Beck was not in custody during the questioning and *Miranda* warnings were not required.

## III.

## CONCLUSION

The deputy lawfully seized the beer can, and statements made during the limited detention did not require *Miranda* warnings. Therefore, the district court's decision affirming the magistrate's order denying the motion to suppress is affirmed.

Chief Judge GUTIERREZ and Judge MELANSON **CONCUR.**