**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 21-10377 |
| *Plaintiff-Appellee,* | D.C. No. 2:20-cr-00204-GMN-EJY-1 |
| v. | |
| XZAVIONE TAYLOR, | |
| *Defendant-Appellant.* | OPINION |

Appeal from the United States District Court
for the District of Nevada
Gloria M. Navarro, District Judge, Presiding

Argued and Submitted December 7, 2022
San Francisco, California

Filed March 1, 2023

Before: Daniel A. Bress and Lawrence VanDyke, Circuit
Judges, and Jane A. Restani,[*] Judge.

Opinion by Judge Bress

---

[*] The Honorable Jane A. Restani, Judge for the United States Court of
International Trade, sitting by designation.

# SUMMARY[**]

## Criminal Law

The panel affirmed the district court's denial of a motion to suppress evidence discovered following a traffic stop, and remanded for the district court to conform the written judgment to its oral pronouncement of sentence, in a case in which Xzavione Taylor entered a conditional guilty plea to being a felon in possession of a firearm.

The panel held that the officers did not unreasonably prolong the traffic stop. The panel wrote:

- An officer's asking Taylor two questions about weapons early in the counter—once before the officer learned that Taylor was on federal supervision for being a felon in possession and once after—was a negligibly burdensome precaution that the officer could reasonably take in the name of safety.

- An officer did not unlawfully prolong the traffic stop when he asked Taylor to exit the vehicle.

- The officers' subjective motivations are irrelevant because the Fourth Amendment's concern with reasonableness allows certain actions to be taking in certain circumstances, whatever the subjective intent.

- A criminal history check and the officers' other actions while Taylor was outside the car were within the lawful scope of the traffic stop.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

- Even if, contrary to precedent, the frisk and criminal history check were beyond the original mission of the traffic stop, they were still permissible based on the officers' reasonable suspicion of an independent offense: Taylor's unlawful possession of a gun.

As to whether the officers violated the Fourth Amendment when they searched Taylor's car, the panel held that the district court did not err in finding that Taylor unequivocally and specifically consented to a search of the car for firearms.

Taylor conceded that precedent forecloses his constitutional challenge to a risk-notification condition of supervised release. The panel remanded for the district court to conform the written judgment to its oral pronouncement of conditions concerning outpatient substance abuse treatment and vocational services programs.

---

## COUNSEL

Aarin E. Kevorkian (argued) and Raquel Lazo, Assistant Federal Public Defenders; Rene L. Valladares, Federal Public Defender; Federal Public Defender's Office; Las Vegas, Nevada; Erin Michelle Gettel, Snell & Wilmer, Las Vegas, Nevada; for Defendant-Appellant.

Peter H. Walkingshaw (argued), James Alexander Blum, and Robert Lawrence Ellman, Assistant United States Attorneys; Elizabeth O. White, Appellate Chief; James M. Frierson, United States Attorney; Office of the United States Attorney, District of Nevada; Reno, Nevada; for Plaintiff-Appellee.

**OPINION**

BRESS, Circuit Judge:

Police stopped Xzavione Taylor for a traffic violation, which led to the discovery of a firearm that Taylor, a convicted felon, could not lawfully possess.  We hold that the officers did not unreasonably prolong the stop and that Taylor voluntarily consented to the search of his car.  We therefore affirm the district court's denial of Taylor's motion to suppress.  But on one aspect of Taylor's supervised release, we remand for the district court to conform its written judgment to the court's oral pronouncement of Taylor's sentence.

I

On July 10, 2020, Officers Anthony Gariano and Brandon Alvarado were patrolling in Northeast Las Vegas when they spotted a car with no license plate or temporary registration tags.  The events that followed were recorded on the officers' body-worn cameras.

Gariano and Alvarado stopped the driver, Xzavione Taylor, who had no driver's license or other means of identification.  When Gariano asked Taylor if he knew why police had pulled him over, Taylor said that he did, explaining that he had just acquired the vehicle from his aunt.  As part of his standard questioning during traffic stops, Gariano asked Taylor whether the vehicle contained any "guns/knives/drugs," which Taylor denied.  In response to Gariano's inquiry whether Taylor had ever been arrested before, including for "anything crazy, anything violent," Taylor stated that he was on parole (i.e., federal supervision) for being a felon in possession of a firearm.  Taylor also

provided Gariano his name, Social Security number, and date of birth.

Gariano later confirmed in his testimony that "everything changed" when he learned that Taylor had been convicted for being a felon in possession because Gariano became concerned that Taylor might be armed. Gariano asked Taylor if he was in violation of his supervision conditions or if he had weapons on him, which Taylor again denied. About a minute and thirty seconds into their conversation, Gariano asked Taylor to step out of the car. Taylor complied.

Until that point, it is not clear how much the officers could see of Taylor's person. Gariano's bodycam footage showed that, at a minimum, Gariano likely could see a red strap on Taylor's left shoulder while Taylor remained seated in his car. Once Taylor emerged from the car, however, it became obvious that he was wearing a distinctive unzipped red fanny pack slung across his upper body.

The unzipped fanny pack appeared to be light and empty. Gariano asked Taylor to remove the fanny pack, and, in the process, Gariano touched, slightly opened, and lifted the pack. Both officers later explained that the empty fanny pack aroused their suspicions. Alvarado testified that "it's known that's where subjects primarily sometimes conceal weapons." Gariano similarly testified that "we've been seeing an . . . uptick of people concealing firearms in fanny packs that are slung around their body," and that he "just wanted to make sure that there [were] no weapons on his person at that point."

Alvarado chatted with Taylor and pat-frisked him. The two recognized each other because Alvarado had been a correctional officer at the prison where Taylor was

previously incarcerated.  As the district court described, the interaction was "calm" and, in fact, "friendly."

Gariano, meanwhile, returned to his patrol car and ran a criminal history check on Taylor, which would also allow him to verify Taylor's identity.  By the time Gariano returned to his patrol car to initiate this computerized check, Taylor had been stopped for around three minutes and had been outside his vehicle for approximately 40 seconds. From his records check, Gariano learned that Taylor had at least two previous felony convictions for grand larceny and robbery.  Gariano exited his patrol car and asked Taylor for consent to search his vehicle.  The conversation went as follows:

> GARIANO: Is there anything in the car?
>
> TAYLOR: No, no I just got it from my aunt.
>
> GARIANO: No guns?
>
> TAYLOR: No, sir.
>
> GARIANO: Alright, cool if we check?
>
> TAYLOR: It don't matter, I just got it, I just got it, it don't matter to me.

Gariano searched Taylor's car for less than a minute and found a handgun under the driver's seat.  Alvarado then placed Taylor under arrest.  Taylor received *Miranda* warnings.  He admitted to the officers that he carried the gun for protection, explaining that he normally placed it in the red fanny pack but kept it under the seat while driving.

A federal grand jury indicted Taylor for being a felon in possession of a firearm.  *See* 18 U.S.C. § 922(g)(1).  Taylor filed a motion to suppress evidence of the gun and his

ensuing incriminating statements as the fruits of an unlawful seizure and search. In his view, the officers violated the Fourth Amendment by prolonging the traffic stop without reasonable suspicion and by searching the car without proper consent.

After a suppression hearing at which Gariano and Alvarado both testified, a magistrate judge recommended granting Taylor's motion to suppress. The district court disagreed. The district court found that once officers observed Taylor's unzipped fanny pack, under the totality of circumstances they had reasonable suspicion to believe that Taylor was a felon in possession of a firearm, so the stop was not unlawfully prolonged. After a remand to the magistrate judge for a recommendation on the consent question, the district court agreed with the magistrate judge that Taylor voluntarily consented to a search of his car. The court thus denied Taylor's motion to suppress.

Taylor entered a conditional guilty plea that preserved his right to appeal the denial of his motion to suppress. He was sentenced to twenty months' imprisonment and three years of supervised release. Taylor now appeals. We review the district court's denial of a motion to suppress de novo and its factual findings for clear error. *United States v. Bontemps*, 977 F.3d 909, 913 (9th Cir. 2020).

II

A

Under the Fourth Amendment, a seizure for a traffic stop is "a relatively brief encounter," "more analogous to a so-called *Terry* stop than to a formal arrest." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (quoting *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (alterations omitted)). To

be lawful, a traffic stop must be limited in its scope: an officer may "address the traffic violation that warranted the stop," make "ordinary inquiries incident to the traffic stop," and "attend to related safety concerns." *Id.* at 354–55 (quotations and alterations omitted). The stop may last "no longer than is necessary to effectuate" these purposes and complete the traffic "mission" safely. *Id.* at 354–55 (first quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion); and then quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). However, a stop "may be extended to conduct an investigation into matters other than the original traffic violation" so long as "the officers have reasonable suspicion of an independent offense." *United States v. Landeros*, 913 F.3d 862, 867 (9th Cir. 2019).

In this case, it is undisputed that the officers had a proper basis for stopping Taylor: he was driving without license plates or temporary tags. Once Taylor was stopped on the side of the street, Gariano was permitted to ask Taylor basic questions, such as whether Taylor knew why he had been pulled over, whether he had identification, whether he had been arrested before, and whether he had any weapons in the vehicle. These are "ordinary inquiries" incident to a traffic stop made as part of "ensuring that vehicles on the road are operated safely and responsibly," or else are "negligibly burdensome precautions" that an officer may take "in order to complete his mission safely." *Rodriguez*, 575 U.S. at 355–56; *see also id.* at 355 (officers during traffic stops may check licenses, check for outstanding warrants against the driver, and inspect registration and insurance); *United States v. Nault*, 41 F.4th 1073, 1078–79, 1081 (9th Cir. 2022). Here, as is typical, these inquiries took mere seconds and were properly within the mission of the stop. Gariano did fleetingly mention drugs in the same breath that he asked

about weapons, but Taylor gave a single answer to the combined question and this did not measurably prolong the stop. *See Rodriguez*, 575 U.S. at 355 ("An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop.").

It is of no moment, as Taylor protests, that Gariano asked about weapons a second time within the first 90 seconds of the stop, after Taylor had already responded in the negative. There is no strong form "asked and answered" prohibition in a Fourth Amendment analysis, the touchstone of which is reasonableness. Asking two questions about weapons early in the encounter—once before Gariano learned that Taylor was on federal supervision for being a felon in possession and once after—was a negligibly burdensome precaution that Gariano could reasonably take in the name of officer safety. *See Maryland v. Wilson*, 519 U.S. 408, 413 (1997) (noting that "traffic stops may be dangerous encounters"). The two questions did not unreasonably prolong the stop. Nothing in our precedents prevented Gariano from verifying an answer to an important question that bore on the danger Taylor might pose.

Gariano also did not unreasonably prolong the stop when he asked Taylor to step out of the vehicle. Decades ago, in *Pennsylvania v. Mimms*, 434 U.S. 106, 110–11 (1977) (per curiam), the Supreme Court held that police officers during a traffic stop may ask the driver to step out of the vehicle. *See also United States v. Williams*, 419 F.3d 1029, 1030 (9th Cir. 2005) ("[I]t is well established that an officer effecting a lawful traffic stop may order the driver and the passengers out of a vehicle . . . ."). The rationale is officer safety: "[t]raffic stops are 'especially fraught with danger to police officers,'" *Rodriguez*, 575 U.S. at 356 (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)), and when it comes to

having a driver stand outside his vehicle, the "legitimate and weighty" justification of officer safety outweighs the "additional intrusion" on the driver, which "can only be described as *de minimis*." *Mimms*, 434 U.S. at 110–11. Once outside the stopped vehicle, the driver may also "be patted down for weapons if the officer reasonably concludes that the driver 'might be armed and presently dangerous.'" *Johnson*, 555 U.S. at 331 (quoting *Mimms*, 434 U.S. at 112).

By this authority, Gariano did not unlawfully prolong the traffic stop when he asked Taylor to exit the vehicle. Taylor argues otherwise, claiming that once he disclosed his felon-in-possession conviction, officers pivoted to a "fishing expedition" into whether Taylor might have a firearm.

This argument is misplaced. The officers' subjective motivations are irrelevant because "the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent." *Whren v. United States*, 517 U.S. 806, 814 (1996). In this case, *Mimms* and its progeny made clear that officers could have Taylor exit his vehicle in the interest of officer safety. *See Johnson*, 555 U.S. at 331. That was so regardless of whether the officers may have subjectively believed they were on to something more than a vehicle lacking license plates. The officers' subjective motivations, whatever they may have been, could not change the objective reasonableness of their actions. *Cf. United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016) ("If, for example, the facts provide probable cause or reasonable suspicion to justify a traffic stop, the stop is lawful even if the officer made the stop only because he wished to investigate a more serious offense.").

Thus far, we have considered the officers' conduct before Taylor exited his car, and we have found that it formed part of the lawful traffic stop. Taylor maintains, however, that the remaining portion of his seizure was too attenuated from the traffic stop. From Taylor's perspective, once he was outside the car, the stop was unconstitutionally prolonged, meaning that the later-discovered gun and Taylor's own inculpatory statements should have been suppressed.

Taylor's argument is unavailing. Doctrinally, we can approach this issue in two different ways, with both paths leading to the same answer: the officers did not violate the Fourth Amendment. The first ground for affirmance on this point is that Gariano's criminal history check and the officers' other actions while Taylor was outside the car were within the lawful scope of the traffic stop. Gariano thus did not improperly prolong the stop when he spent a few minutes consulting computerized databases in his patrol car. In *United States v. Hylton*, 30 F.4th 842 (9th Cir. 2022), we specifically rejected the argument that a "criminal history check [is] a prolongation of the stop and need[s] to be supported by independent reasonable suspicion." *Id.* at 847. Instead, we aligned ourselves with the other circuits and held that "because a criminal history check 'stems from the mission of the stop itself,' it is a 'negligibly burdensome precaution' necessary 'to complete the stop safely.'" *Id.* at 848 (quoting *Rodriguez*, 575 U.S. at 356) (alterations omitted).

Taylor asserts that *Hylton* should not govern because here the officers knew or should have known that Taylor posed no danger when he was compliant during the stop, which had friendly overtones. Taylor's effort to distinguish *Hylton* fails. Taylor again improperly focuses on what the

officers might have subjectively believed when what matters, under *Hylton*, is that conducting a criminal records check in connection with a traffic stop is objectively reasonable. The officers here did not abandon the traffic stop and acted properly under *Hylton*. It is true that Taylor was compliant. But that a driver is acting cooperatively does not prevent police from performing actions that are permissibly within the mission of a traffic stop. Regardless, the officers clearly did have a basis to believe that Taylor posed a danger, as we will discuss.

Taylor points out that officers began the process of checking him for weapons before Gariano went to his patrol car to check criminal history, claiming that this part of the pat-down also unreasonably extended the stop. But as we noted above, officers in the course of a lawful investigatory stop of a vehicle may pat down the driver for weapons "if the officer reasonably concludes that the driver 'might be armed and presently dangerous.'" *Johnson*, 555 U.S. at 331 (quoting *Mimms*, 434 U.S. at 112). Here, the officers could have had that reasonable suspicion once they observed Taylor fully outside of the vehicle.

The reasonable suspicion standard "is not a particularly high threshold to reach" and is less than probable cause or a preponderance of the evidence. *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc). The standard allows officers to make "commonsense judgments and inferences about human behavior." *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)). In doing so, officers may "draw on their own experience and specialized training" to arrive at conclusions "that might well elude an untrained person." *Valdes-Vega*, 738 F.3d at 1078 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

At the point when Gariano asked Taylor, consistent with *Mimms*, to exit the vehicle, the officers knew that Taylor was driving a vehicle without license plates or registration tags, that he lacked identification, and that he was on federal supervision for being a felon in possession of a firearm. But once Taylor stepped out of the car, officers had another data point: Taylor's distinctive unzipped fanny pack slung across his chest. Both officers testified that fanny packs are commonly used to store weapons, with Gariano noting police had seen "an uptick" in this behavior. The district court did not clearly err in crediting the officers' testimony. *See Bontemps*, 977 F.3d at 917 (district court's factual finding that a bulge in clothing appeared to be a firearm was not illogical or implausible when it was based on credible officer testimony). That the fanny pack was empty and unzipped added to the reasonable suspicion. As Officer Alvarado testified, it was "odd" that Taylor had the fanny pack "on his person" when "there was nothing in it."

We of course recognize that standing alone, a fanny pack is not necessarily an unusual item of apparel. We certainly do not suggest that officers have reasonable suspicion to frisk anyone who wears that accessory. But here, the fanny pack was curiously empty and unzipped, and it did not stand on its own: officers had just pulled Taylor over for driving without license plates, Taylor had no identification, and, most critically, Taylor had just disclosed that he was on federal supervision for being a felon in possession of a firearm. When combined with the officers' experience with fanny packs, the circumstances taken as a whole created reasonable suspicion that Taylor, who was not permitted to have a gun, might have one. *Cf. United States v. Garcia*, 909 F.2d 389, 391–92 (9th Cir. 1990) (affirming the denial of motion to suppress because based on the totality of

circumstances, "reasonably prudent officers would have patted down both the man and the [fanny] pack that could have contained a weapon"). Reasonable suspicion existed regardless of whether Northeast Las Vegas is a high crime area, a point Taylor disputes.

We mentioned above that there is a second doctrinal pathway to affirming the denial of Taylor's motion to suppress as to the duration of the stop once Taylor stepped out of the car. The second pathway is this: even if officers prolonged the encounter beyond the original mission of the traffic stop, they had a sufficient basis to do so. As we have described, the officers knew about Taylor's traffic offenses and that he was on federal supervision for being a felon in possession, and once Taylor stepped out of the car, the officers could clearly see Taylor's unzipped, empty fanny pack. At that point, under the totality of the circumstances, and for the reasons we gave above, officers had "reasonable suspicion of an independent offense." *Landeros*, 913 F.3d at 867; *see also Rodriguez*, 575 U.S. at 358. Thus, even if, contrary to precedent, the frisk and criminal history check were beyond the mission of the traffic stop, they were still permissible based on the officers' reasonable suspicion of an independent offense: Taylor's unlawful possession of a gun.

## B

Having concluded that the stop was not unlawfully prolonged, we turn next to whether officers violated the Fourth Amendment when they searched Taylor's car. "Warrantless searches are presumptively unreasonable under the Fourth Amendment, subject to certain exceptions." *Verdun v. City of San Diego*, 51 F.4th 1033, 1037–38 (9th Cir. 2022). Consent is one such "specifically established" exception. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219

(1973). Police may search a car when they are given "voluntary," "unequivocal[,] and specific" consent. *United States v. Basher*, 629 F.3d 1161, 1167–68 (9th Cir. 2011).

The district court did not err in concluding that Taylor's consent was voluntary. We analyze the voluntariness of consent based on "the totality of all the circumstances," *Schneckloth*, 412 U.S. at 227, with our precedents focusing on five non-exclusive factors: "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was notified that [he] had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *Basher*, 629 F.3d at 1168 (quoting *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004)). A defendant's consent is not voluntary "if his will has been overborne and his capacity for self-determination critically impaired." *Schneckloth*, 412 U.S. at 225 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).

Here, Taylor was not in custody, so no *Miranda* warnings were given or required, *see Berkemer v. McCarty*, 468 U.S. 420, 440 (1984); officers did not have their guns drawn; and the officers never threatened Taylor that a search warrant could be obtained if he refused consent. These factors all suggest that Taylor's consent was voluntary. *See Basher*, 629 F.3d at 1168. The government was not required to prove that Taylor knew he had a "right to refuse consent" as a "necessary prerequisite to demonstrating a 'voluntary' consent." *Schneckloth*, 412 U.S. at 232–33. Even so, that officers never informed Taylor he had a right not to consent is at least a factor that weighs against voluntariness. *See Basher*, 629 F.3d at 1168.

We have encountered a similar constellation of facts before.  In *Basher*, as here, officers asked for consent while the suspect was not in custody, they did not have guns drawn, and they made no mention of *Miranda*, search warrants, or the suspect's right to refuse consent.  *Id.* Balancing those factors, we held consent to be voluntary.  *Id.* We struck the same balance even earlier, in *United States v. Kim*, 25 F.3d 1426, 1432 (9th Cir. 1994).

The balance of the factors here is substantially similar to *Basher* and *Kim*.  The district court also found—and the bodycam footage bears out—that "the entire interaction was calm[] and could even be described as friendly."  That finding is not clearly erroneous.  Nothing in the record suggests that Taylor's will was overborne.  *Schneckloth*, 412 U.S. at 225–26.

Citing "racial disparities in the policing of America," Taylor argues that we should treat his consent as involuntary because the officers are of a different race than him.  We reject this argument.  As the district court found, although tensions between officers and suspects "may be heightened by personal experiences and other sociocultural factors," there was no evidence in this case that race affected the voluntariness of Taylor's consent.

Taylor's consent was also unequivocal and specific, and it included consent to search the interior of the car for guns. A suspect may "unequivocal[ly] and specific[ally]" consent by giving express permission, or consent can be inferred from conduct, such as a head nod.  *See Basher*, 629 F.3d at 1167–68.    Ultimately, the test "is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

The district court did not err in finding that Taylor unequivocally and specifically consented to a search of his car for firearms.  When Gariano asked if there were guns in the car and then asked if he could "check," Taylor unambiguously responded, "it don't matter to me."   In context, a reasonable person would have understood Taylor to be consenting to a search of the car for firearms in locations where a gun might be concealed. *See id.*  Taylor's suggestion that he was only consenting to officers walking around the car and looking in the windows is not objectively reasonable given the nature of the exchange.  We thus hold that the officers did not violate the Fourth Amendment when searching Taylor's car.

## III

We lastly consider two sentencing issues.  First, Taylor challenges as unconstitutionally vague and overbroad Standard Condition 12 of his supervised release, which requires him to comply with a probation officer's instructions to notify others of the risks posed by his criminal record.  Although the parties dispute whether Taylor in his plea agreement waived the right to appeal this issue, Taylor concedes that our precedent forecloses his claim. *See United States v. Gibson*, 998 F.3d 415, 423 (9th Cir. 2021).

Second, in its oral pronouncement of Taylor's sentence, the district court ordered that for his outpatient substance abuse treatment and vocational services programs (Special Conditions One and Six), Taylor "must pay the cost of the program[s] based on [his] ability to pay."  But the written judgment requires Taylor to pay the costs of these programs, without referencing his ability to pay.  "When there is a discrepancy between an unambiguous oral pronouncement of a sentence and the written judgment, the oral

pronouncement controls." *United States v. Fifield*, 432 F.3d 1056, 1059 n.3 (9th Cir. 2005). The parties thus agree that to resolve this discrepancy, we should remand to the district court so it can conform the written judgment to its oral pronouncement.

*     *     *

For the foregoing reasons, we affirm Taylor's conviction. As to Special Conditions One and Six, we remand to the district court to conform the written judgment to the orally pronounced sentence.

**AFFIRMED** in part; **REMANDED** in part.