IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 18, 2019 Session

## STATE OF TENNESSEE v. BRIAN ANTHONY WILEY

**Appeal from the Circuit Court for Coffee County**
**No. 43,093F     Vanessa A. Jackson, Judge**

———————————

## No. M2018-01817-CCA-R3-CD

———————————

The Defendant, Brian Anthony Wiley, pled guilty to multiple drug offenses and received an effective eight-year sentence. The Defendant's plea agreement reserved a certified question of law regarding the legality of the search of the Defendant's automobile that was parked in the overnight camping area of a local music festival. Following our review, we conclude that the warrantless search of the Defendant's automobile did not violate Fourth Amendment protections and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Lee Davis, Chattanooga, Tennessee, for the appellant, Brian Anthony Wiley.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Assistant Attorney General; Craig Northcott, District Attorney General; and Jason M. Ponder, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
FACTUAL BACKGROUND

Following the search of the Defendant's automobile at Bonnaroo Music Festival ("Festival" or "Bonnaroo"), the Coffee County Grand Jury returned an eight-count indictment against the Defendant in July 2016. The Defendant was charged with possessing the following controlled substances with the intent to sell or deliver in violation of Tennessee Code Annotated section 39-17-417 (Counts 1 through 7, respectively): psilocyn; lysergic acid diethylamide ("LSD"); methylenedioxymethamphetamine ("MDMA"); alprazolam; marijuana (14.175 grams or more, but less than ten pounds); tetrahydrocannabinol ("THC") (less than two pounds);

and cocaine (0.5 grams or more).  He was also charged with possessing drug paraphernalia (Count 8).  See Tenn. Code Ann. § 39-17-425.

The Defendant filed a motion to suppress the evidence, alleging that he was unlawfully detained and that the warrantless search of his car violated the Fourth Amendment.  The Defendant maintained that the camping area of the Festival was afforded the same protections as a hotel room and that the officers' intrusion onto his campsite, which included his "bed, body, belongings, and vehicle[,]" was unconstitutional.  Specifically, the Defendant argued as follows:

> [The Defendant] had a reasonable expectation of privacy in his home/vehicle campsite at Bonnaroo.  Bonnaroo entered into an agreement with [the Defendant] (independent of the festival ticket) for the use of this space as a home camp.  [The Defendant] was at his campsite when officers approached.  With the bare information that he was from Chattanooga and allegedly a companion to another man, Trevor Watson[,] whom they had recently arrested, [the Defendant] was seized, taken into custody and searched by Coffee County Deputies.  No contraband was visible at his campsite, no illegal activities were occurring at the campsite or in the officers['] presence.  The detention and arrest of [the Defendant] was illegal.  Even more problematic is the search of [the Defendant's] vehicle/domicile.  The search of [the Defendant's] vehicle/domicile was unreasonable and is constitutionally prohibited . . . .  The fruits of this illegal search must be suppressed[.]

Regarding the search of his automobile, the Defendant submitted that the intrusion of a drug-sniffing dog onto his campsite was unconstitutional, that the dog's alert on his vehicle could not justify the warrantless search of his rented, temporary living space, and that no other exception to the warrant requirement applied.

A hearing was held on April 12, 2017, at which the investigating officer, Investigator James Sherrill with the Coffee County Sheriff's Department; the Defendant's sister, Andrea Anthony; and the Defendant testified.  The following evidence was adduced at the hearing.

Bonnaroo is an annual event located on a 700-acre private farm in Coffee County, Tennessee.  It is a four-day music festival, often with more than 90,000 people in attendance.  In addition to purchasing a general admission ticket to the Festival, concertgoers may opt to pay a separate car camping fee that allows for camping in designated overnight camping areas.  These campsites are apart and separate from the music stages but within the 700-acre venue.  In addition, there are separate general parking areas for concertgoers that do not pay for overnight camping.

A month prior to the event, on May 16, 2016, the Defendant purchased a general admission ticket to attend Bonnaroo 2016 for $349.50. The terms of admission printed on the ticket state, in pertinent part:

> This ticket is a revocable license for the time listed on the front hereof. Management reserves the right, without refund of any portion of the ticket purchase price, to refuse admission or eject any person who fails to comply with the rules of the venue, local, state, or federal law, or whose conduct is deemed illegal, disorderly, or offensive by management. Persons entering the facility are subject to search for contraband, alcohol, controlled substances, weapons, firearms, fireworks, cameras, video equipment or recording devices, which are expressly forbidden and subject to confiscation.

The Defendant also separately purchased a car camping pass for $59.75. Bonnaroo management operates controlled entry points to the Festival in the form of "tollbooths" where vehicles and persons entering the facility are subject to search. According to Investigator Sherrill, concertgoers and campers "know they're subject to search once they come onto Bonnaroo grounds." Investigator Sherrill had, in the past, seen Bonnaroo security remove patrons who refused to be searched.

On Wednesday, June 8, 2016, the Defendant, who hailed from Chattanooga, arrived at Bonnaroo in his Honda Civic. The Defendant's sister had followed him in her own car. Both their vehicles were searched at a tollbooth upon entry, and they proceeded to the car camping area as directed by Bonnaroo staff. Investigator Sherrill described the layout of the camping area: "[T]he cars will be lined up, and the tents will be beside the cars, and then there will be another row of cars, and then there will be a traffic lane." He indicated that there were "lanes of travel where you can walk or drive in" and that those lanes were kept clear for emergency purposes. The Defendant offered a photograph showing how the cars were parked and the tents set up in the camping area. He also presented an aerial photograph reflecting the appearance of the Bonnaroo property during the Festival.

The Defendant and his sister were instructed to park in a specific manner in a portion of the camping area known as "Pod 9" and were each given "a square"[1] area to set up their respective campsites. The Defendant parked behind another vehicle and his sister parked behind him. Her front bumper was facing the Defendant's back bumper. According to the Defendant and his sister, their cars were lined up bumper-to-bumper.

---

[1] Investigator Sherrill was unsure of the dimensions of each individual campsite.

Once parked in the overnight camping area, the Defendant and his sister proceeded to set up their respective campsites. The Defendant placed an easy-up canopy tent next to a sleeping tent in the square area adjacent to his car. Together the easy-up canopy, sleeping tent, and the Defendant's vehicle served as his temporary home—where he slept, kept belongings, and generally lived for the duration of the Festival. The Defendant's sister set up a similar accommodation at a campsite location next to the Defendant's. The Defendant, his sister, and his girlfriend (who met him at the Festival) spent their first night at the campsite and the next day at the Festival without incident.

Investigator Sherrill worked the Festival annually, and he testified that on June 9, 2016, he was patrolling Pod 9, along with five other officers. While they were "walking through the camping areas checking on everybody," Investigator Sherrill "heard a male subject," later identified as Trevor Watson, "trying to sell some acid to a gentleman in a tent." Investigator Sherrill approached Mr. Watson and spoke with him. He learned that Mr. Watson "had some narcotics on his person in his backpack." Upon search of Mr. Watson's backpack, Investigator Sherrill observed "multicolored pouches" containing drugs—LSD, marijuana, and MDMA or "Molly."

Mr. Watson, who began to cry, advised Investigator Sherrill that "he was with a group . . . selling large amounts of narcotics" at the Festival; exclaimed that Investigator Sherrill "was ruining his life by arresting him because he was in school"; and indicated that "if [Investigator Sherrill] would help him, [then] he would help" Investigator Sherrill with a "bigger bust." Investigator Sherrill informed Mr. Watson "that [he] could speak with the [district attorney] once [Mr. Watson] was arrested and see what [they] could do with [Mr. Watson's] charges." Mr. Watson then "pointed" Investigator Sherrill "in the general direction" of the Defendant, telling Investigator Sherill that "there was some guy named Brian from Chattanooga up at another place in Pod 9[,]" and providing a description of the individual's car and the location where the car was parked. Investigator Sherrill stayed to attend to Mr. Watson while several other officers went in search of the described vehicle and potential suspect.

At 9:35 p.m., Investigator Sherrill encountered the Defendant at his campsite. Neither the Defendant nor any of the other campers present at the campsite were doing anything illegal at that time. Investigator Sherrill indicated that the Defendant was parked "at the very end of the row at the pod" and that the Defendant "was second or third to the end of the whole row." According to Investigator Sherrill, the Defendant could have left his campsite at any time because his avenue for exit was unobstructed.

Upon approach to the campsite, the Defendant was "standing outside his vehicle at the trunk," which Investigator Sherrill recalled being open. The Defendant identified himself and told Investigator Sherrill that he hailed from Chattanooga. Investigator Sherrill testified that he advised the Defendant "of the information that [they] had"

received from Mr. Watson regarding the Defendant's "selling narcotics" at the Festival; however, the Defendant refused to answer most of Investigator Sherrill's questions. Investigator Sherrill "began to look in the car[,]"[2] which had a Hamilton County license plate. He said that he "walked up to the door" of the car, "looked in the window with [his] flashlight," and saw "bags in the front passenger floorboard"[3] that matched the bags in Mr. Watson's possession. Investigator Sherill "grabbed [the Defendant] by the back of the shirt[,]" walked him underneath the easy-up canopy tent, and "command[ed]" that the Defendant sit down. Investigator Sherrill affirmed that the Defendant was being detained at that time and was not free to leave. Also, Investigator Sherrill said that he would not describe the easy-up canopy tent as a "living area" but as an "open-air tent." He did not recall any "tapestry sides" being hung.

Investigator Sherrill asked the Defendant for consent to search his car. According to Investigator Sherrill, the Defendant was acting "real nervous" and "began just about to hyperventilate"; his chest appeared to be "pounding"; and he "started profusely sweating." The Defendant refused to give his consent to search his vehicle, so at 9:37 p.m., Investigator Sherrill, believing that he had reasonable suspicion, called for a K-9 officer and Bonnaroo security to assist. Investigator Sherrill stated that while waiting, he began "checking warrants" for the Defendant and the three "other subjects," two males and one female, who were being detained at the campsite. In addition, the officers had received permission from the female subject, the Defendant's sister,[4] to search her car, and "there was nothing [found] in that vehicle." They also received consent from the other two male subjects to search their backpacks and found nothing. According to Investigator Sherrill, the K-9 officer arrived quickly, arriving before the warrants check had been completed. The K-9 twice indicated to the presence of drugs in the Defendant's car, and the officers "started searching" the Defendant's vehicle. Ultimately, the other individuals were allowed to leave because they were not involved in any criminal activity.

The Defendant's vehicle was locked. When asked how he acquired the keys to the Defendant's automobile, Investigator Sherrill responded, "If I'm not mistaken, I got them off the table that was inside the tent area." Investigator Sherrill indicated that the key to

---

[2] Investigator Sherrill could not recall for certain whether he looked in the car before or after he requested the K-9 officer. But he believed it was before because he and the Defendant "were standing there" near the trunk when he looked inside.

[3] He later stated that the bags were in the front seat. In addition, he indicated that there were "pouches throughout the vehicle."

[4] Investigator Sherrill indicated that this was the Defendant's girlfriend, but it was Ms. Anthony, the Defendant's sister. Investigator Sherrill recalled only one female's being present. It appears from the record that both the Defendant's girlfriend and sister were there.

the Defendant's car was in the Defendant's hand when Investigator Sherrill arrived at the campsite, but Investigator Sherrill could not recall any officer's taking the key out of the Defendant's hand. Investigator Sherrill stated that after unlocking the Defendant's car, "[a]s soon as [they] got into it, . . . the first thing [he] found was one of those multicolored bags with some marijuana" inside. "One of the officers had found one of the multicolored bags that had some cash in it." Investigator Sherrill then instructed the officers to halt the search, and Investigator Sherrill drove the Defendant's vehicle to the "command center" on Bonnaroo property. Once at the command center, the search continued. Investigator Sherrill specifically recalled finding "202 bottles of THC oil; approximately 500 bags . . . of MDMA Molly; 220 something bags of marijuana; [and] almost $29,000 worth of cash." According to Investigator Sherrill, the items were found "all over" the Defendant's automobile—the trunk, the passenger's seat, and the floorboard. The Defendant was then placed under arrest.

The Defendant's sister also testified at the hearing. She stated that she met the Defendant in Chattanooga and followed him in her vehicle to the Festival. She confirmed that both cars were searched upon entry to the Bonnaroo property. Regarding their camping spaces, the Defendant's sister said that they were not parked in the last row but possibly "the second to last row of cars." She opined that the bumpers of their respective cars were not very far apart, maybe "[a] foot."

On the evening of June 9, 2016, she "had come back to the tent area" and "was cooking dinner for [her]self outside of the little tapestry area outside of the easy-up." She stated that the "six officers approached [their] camping area, and the one that had walked towards [her] asked [her] to stop what [she] was doing and go into the area where the chairs were and asked [her] to sit down so that [they] could have a little chat." The Defendant's sister indicated that the Defendant's girlfriend was also present. None of the individuals present were engaged in any illegal activity at the time the officers approached, according to the Defendant's sister. The Defendant's sister said that the officers asked them all where they were from and that everyone responded. She and her brother acknowledged ownership of each of the two vehicles present. She confirmed that she consented to a search of her vehicle, as well as to a search of her tent, and that the two other men agreed to have their backpacks searched. She relayed that the officers informed them of the information they had received from Mr. Watson and that the officers "made a lot of threatening remarks about removing [their] wrist bands and kicking [them] out" of the Festival.

Ultimately, the officers allowed the Defendant's sister to leave, and she left with the Defendant's girlfriend to return to the concert area. The Defendant, who was seated separately, was still being detained when she left. When she later returned to the

campsite, her brother and his vehicle were gone. The Defendant's sister indicated that she was "incredibly surprised" by what was found in her brother's car.

The thirty-year-old Defendant testified. He confirmed that he bought a general admission ticket to the Festival, as well as a car camping pass. A copy of the email confirming the Defendant's purchase and the terms of his Festival ticket was exhibited. According to the Defendant, his car camping pass entitled him to a 20' x 20' area on which to set up his camp, although the specifics of the campsite or the terms of that agreement are not present in the copy of the email.[5]

The Defendant explained that there were approximately four cars in his convoy from Chattanooga to the Festival—his, his sister's, a female friend's, and Mr. Watson's. According to the Defendant, he had known Mr. Watson for about a year and a half before the June 2016 festival, and they had become friends. They met when Mr. Watson served as the Defendant's "personal trainer at a local gym in Chattanooga."

The Defendant disputed that he and his sister were parked in the last row of cars, claiming that there was another row of cars between them and the boundary. He claimed that "this year," they "were all sandwiched in there" in Pod 9, and there were not the customary exit lanes. He asserted that he was parked in "the middle of the row of cars with other cars and tents surrounding [his] 20-by-20 section." The Defendant described the camping area that he and his sister constructed: "We had several tents set up. My sister and I connected our easy-up tents, . . . , and we hung tapestries on all the sides all the way around to completely enclose it from the sun so we wouldn't get burned because it always gets pretty hot out there at Bonnaroo." The Defendant maintained that the purpose of the easy-up canopy tent area was to provide them with a "common area," similar to a living room. They had each erected sleeping tents next to the easy-up canopy area. The Defendant said that their vehicles were also parked on their respective campsites, and he maintained that he kept his personal effects in his car.

The Defendant provided details of the encounter with the officers on the evening of June 9, 2016. He asserted that he was returning from using the restroom and was placing the toilet paper back in his trunk when the officers approached. After he shut his trunk, Investigator Sherrill appeared and asked him in what city he resided. When the Defendant replied that he was from Chattanooga, Investigator Sherrill "grabbed [him] by the back of [his] neck and walked [him] into [their] canopy section and sat [him] down in the chair and said, 'Your buddy Trevor just got caught selling a bunch of acid.' He said, 'Don't you F'ing move.'" The Defendant described that "there w[ere] other sheriff's

---

[5] Other than the Defendant's own testimony, there was no evidence establishing the size of the campsite areas. Furthermore, there was no evidence or testimony that the spaces had any defined boundaries.

officers posted up at all four corners" and that "they had the campsite completely surrounded." The Defendant did not feel like he was free to leave at that point.

The Defendant continued,

Deputy Sherrill said, "Your buddy Trevor is going to jail for 20 years. If anybody has any dope on them, tell us now or you're going to jail." I didn't have anything on me. They stood me up and patted me down. I didn't have any contraband on me. They patted down everybody else at the campsite, and nobody had anything on them.

Deputy Sherrill asked for my permission if I would give consent to search my vehicle, and I told him "No." They asked my sister, and she said, "Yes." She complied and let them search her vehicle.

According to the Defendant, Investigator Sherrill, during this time, "was mad. . . . [H]e was furious. He was barking orders. He was red in the face. He was pissed."

Regarding possession of his car key, the Defendant claimed that he had his car key in his hand and that another officer "walked up to [him] and literally pried [his] fingers open and grabbed" the key from his hand. The Defendant maintained that this occurred "before the dog ever even showed up" and that he never consented to anyone's taking his car key.

According to the Defendant, he was seated under the easy-up canopy tent area when the dog "eventually" arrived. He claimed that he never personally saw the dog, but he knew the dog was there. The Defendant explained, "They said the dog alerted, and they held up a tennis ball and said the dog had alerted and asked me if I wanted to keep the tennis ball, being real smart about it, asked me if I wanted it as a souvenir." The officers proceeded to search his locked car that they opened with his key.

The trial court entered a written order on May 18, 2017, denying the Defendant's motion to suppress the evidence. First, the trial court determined that the testimony of Investigator Sherrill and the Defendant's sister was credible, while the Defendant's testimony was not. The trial court then made detailed findings of facts before addressing the merits of the Defendant's legal argument. Ultimately, the trial court determined that the search of the Defendant's automobile fell within the "automobile exception" to the warrant requirement. In so concluding, the trial court reasoned,

This exception applies when an officer has probable cause to believe that an automobile contains contraband. The officer may seize the automobile and

obtain a search warrant or instead may search the automobile immediately. State v. Saine, 297 S.W.3d 199 (Tenn. 2009).

Investigator Sherrill chose to search the vehicle immediately. In order for his search to fall within the "automobile exception," he must have had probable cause to believe that contraband was located within the Defendant's vehicle. Probable cause is a flexible, common sense standard which requires a reasonable ground for suspicion supported by circumstances indicative of an illegal act. The [c]ourt finds that Investigator Sherrill had probable cause based upon: (1) the information given by Trevor Watson that he was part of a group of people at Bonnaroo selling drugs; (2) Watson's attempt to lessen his own culpability by revealing to [Investigator] Sherrill the identity of the Defendant as one of the people selling drugs; (3) the description of the Defendant's automobile and campsite given by Watson; (4) finding the automobile and campsite that matched Watson's description; (5) seeing the unusual multi-colored zippered bags/pouches in [the] Defendant's automobile similar to ones found on Trevor Watson; and (6) the K-9 dog['s] alerting on [the] Defendant's automobile for the presence of narcotics.

The Defendant filed a motion to reconsider on May 30, 2018,[6] which was premised on the recent United States Supreme Court case of Collins v. Virginia, --- U.S. ---, 138 S. Ct. 1663 (2018). The Defendant argued that his campsite at the Festival was afforded the same Fourth Amendment protections as the curtilage of one's own home. In Collins, the United States Supreme Court held that an officer who saw a parked motorcycle covered by a tarp, "walked onto the residential property and up to the top of the driveway," and "pulled off the tarp, revealing a motorcycle that looked like the one from [a] speeding incident," entered the curtilage of the residence to conduct the search. 138 U.S. at 1668, 1671. The Defendant asserted that Collins mandated suppression of the drugs in this case.

The trial court denied the Defendant's motion to reconsider by written order filed on September 20, 2018, reasoning that the detention of the Defendant and warrantless search of his car did not occur in a place with similar privacy features. Regarding findings of fact, the trial court observed,

1. On May 16, [2016, the] Defendant purchased a ticket to the Bonnaroo Music Festival . . . .

---

[6] During the interim, the trial court granted the Defendant permission for an interlocutory appeal to this court. However, we declined to grant review.

2. The ticket sets forth the terms and conditions applicable to the Defendant's attendance of the Festival and camping pass.

3. As part of the terms and conditions, the ticket contains the following language:

(a) "This ticket is a revocable license for the time on the front hereof."

(b) "Persons entering the facility are subject to search for contraband, alcohol, controlled substances, weapons, firearms, fireworks, cameras, video equipment or recording devices, which are expressly forbidden and subject to confiscation."

4. With regard to Defendant's purchase of a license to camp, the ticket simply states, "Car Camping Pass One Vehicle." The ticket does not describe a specific campsite or give any other information about the camping site. . . . The ticket does not contain language granting exclusive control of the campsite to the camper.

The trial court then made the following conclusions of law:

[T]he Defendant clearly had no expectation of privacy upon entering the Festival. The terms of admittance to the Festival as set forth on his ticket make clear that he is subject to search for controlled substances. The Defendant purchased a license to camp, which did not afford him rights equivalent to that of a homeowner, lessee or occupant of a hotel room.

Thereafter, on September 26, 2018, the Defendant pled guilty to five counts of the indictment, pleading guilty to the lesser-included offense of attempted possession with the intent to sell or deliver psilocyn, LSD, and MDMA (Counts 1, 2, and 3), and guilty as charged to possession with the intent to sell or deliver alprazolam and marijuana (Counts 4 and 5). The Defendant received concurrent, six-year sentences for Counts 1, 2, and 3, with service of 365 days' incarceration before being released on supervised probation. The Defendant received concurrent, two-year sentences for Counts 4 and 5, which effective sentence was suspended to supervised probation. The judgment forms reflect that the Defendant's effective six-year sentence from Count 1, 2, and 3, and his effective two-year sentence from Counts 4 and 5, were to be served consecutively to one another,

resulting in an effective eight-year sentence.[7]  The remaining three counts, involving possession of THC, cocaine, and drug paraphernalia (Counts 6, 7, and 8), were dismissed.

As part of the guilty plea, the Defendant reserved, with the consent of the State and the trial court, the following certified question:

> Whether the trial court erred in denying [the D]efendant's motion to suppress alleging [the] Defendant's Fourth Amendment rights were violated by police who, without probable cause, entered a tent on [the] Defendant's privately rented campsite (a temporary accommodation) at Bonnaroo without invitation, questioned him, detained him, and when he refused to consent to a vehicle search, conducted a warrantless search of his car parked within the 20' x 20' rented campsite, an area where the Defendant had a reasonable expectation of privacy?

The case is now before us for our review.

## ANALYSIS

On appeal, the Defendant argues that the trial court erred in denying his motion to suppress because he had a reasonable expectation of privacy in his rented campsite and the automobile exception to the warrant requirement did not apply.  Specifically, according to the Defendant, his campsite—comprised of a tent, a canopy structure, and a vehicle—should be afforded the same constitutional protections extended to temporary accommodations like a hotel room, which often involve licenses rather than actual property interests; the automobile exception to the warrant requirement does not apply "given the location of [the Defendant's] vehicle parked within" the curtilage of his campsite; and the intrusion of a drug-sniffing dog does not "justify the warrantless search given the location of [the Defendant's] vehicle parked within his campsite."  The State responds that "[t]he concept of curtilage is largely meaningless at Bonnaroo" and that "both the nature of the 'accommodation' and the terms that were attached to it show that there is no reasonable expectation of privacy in car camping at Bonnaroo."

Although this case comes to us on appeal as a certified question of law under Tennessee Rule of Criminal Procedure 37(b)(2), we review it under the same standard as an appeal from a judgment denying a motion to suppress. See State v. Nicholson, 188 S.W.3d 649, 656 (Tenn. 2006).  The "trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928

---

[7] A transcript of the guilty plea hearing is not included in the appellate record, and the guilty plea acknowledgement and waiver of rights signed by the Defendant is only one page and does not contain a sentencing recommendation.  A notation on Count 4 of the judgment forms reflects that the sentence-imposed date was the same day that the Defendant entered his guilty plea.

S.W.2d 18, 23 (Tenn. 1996). Likewise, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial court. State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000) (citing Odom, 928 S.W.2d at 23). Furthermore, although "[t]he party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence," Odom, 928 S.W.2d at 23, the burden remains on the State to prove that a warrantless search was constitutionally permissible. Nicholson, 188 S.W.3d at 656-57; State v. Henning, 975 S.W.2d 290, 298 (Tenn. 1998). Our review of the application of the law to the facts is de novo. State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008).

The Fourth Amendment to the Constitution of the United States, applicable to the states through the Fourteenth Amendment as recognized in Mapp v. Ohio, 367 U.S. 643, 650 (1961), provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Similarly, article I, section 7 of the Tennessee Constitution provides

[t]hat the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

"The purpose of the prohibition against unreasonable searches and seizures under the Fourth Amendment is to 'safeguard the privacy and security of individuals against arbitrary invasions [by] government[al] officials.'" State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997) (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)). Any warrantless search or seizure is presumed to be unreasonable and requires the State to prove by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement. State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998).

The Defendant's issues on appeal take umbrage with the officers' entry onto his campsite.[8] He begins his analysis by setting forth the oft-cited "reasonable-expectations test." See United States v. Katz, 389 U.S. 347 (1967). Under this test, a warrantless intrusion by government agents onto a homeowner's real property does not violate either the federal or state constitution unless the intrusion violates the homeowner's "reasonable expectation of privacy." State v. Christensen, 517 S.W.3d 60, 77-78 (Tenn. 2017) (citing Katz, 389 U.S. at 361 (Harlan, J., concurring); State v. Talley, 307 S.W.3d 723, 730 (Tenn. 2010)). Initially, it is the homeowner's burden to establish that he had a "reasonable expectation of privacy" against the intrusion. Id. at 78 (quoting Talley, 307 S.W.3d at 730). The homeowner must satisfy two prongs: (1) that he had "an actual, subjective expectation of privacy," and (2) that "society is willing to view [his] subjective expectation of privacy as reasonable and justifiable under the circumstances." Talley, 307 S.W.3d at 730 (quoting State v. Munn, 56 S.W.3d 486, 494 (Tenn. 2001)).

However, the United States Supreme Court has made clear that "[t]he Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment," i.e., the common-law trespassory test. Christensen, 517 S.W.3d at 77 (quoting Florida v. Jardines, 569 U.S. 1, 11 (2013)); see also United States v. Jones, 565 U.S. 400, 409 (2012). For much of our history, the Fourth Amendment was understood to be concerned only with government trespasses upon the rights of individuals under the common law to be secure in their "persons, houses, papers, and effects."[9] See Jones, 565 U.S. at 406; see also Carpenter v. United States, --- U.S. ---, 138 S. Ct. 2206, 2213-14 (2018). Accordingly, to determine whether a government act amounted to a search, American courts traditionally asked whether the act was to "obtain[] information by physically intruding on a constitutionally protected area." Jones, 565 U.S. at 406 n.3. "One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy." See Jardines, 569 U.S. at 11. If either standard—the property-based test discussed in Jardines or the reasonable-expectations test of Katz—is satisfied, the government act in question generally will amount to a search that implicates the Fourth Amendment. See Jones, 565 U.S. at 409. The Tennessee Supreme Court has observed that "when a police officer obtains information by physically intruding into someone's house, a search within the original meaning of the Fourth Amendment has undoubtedly occurred." Christensen, 517 S.W.3d at 69 (quoting Jardines, 569 U.S. at 5; see also Lester v. State, 393 S.W.2d 288, 289-90

---

[8] While the Defendant's certified question references his detention and subsequent questioning, he does not, nor did he in the trial court, argue that his detention itself was violative of the Fourth Amendment. Moreover, discovery of the drugs resulted from the search of the car, which was by and large unrelated to his detention. He also makes no challenge to the taking of his car key.

[9] Both the Fourth Amendment and article I, section 7 of the Tennessee Constitution refer to "houses." Christensen, 517 S.W.3d at 69.

-13-

(Tenn. 1965) (stating that a search within the meaning of the Tennessee Constitution occurs when the police examine "a man's home . . . with a view to the discovery of . . . some evidence of guilt")).

The Defendant purchased a camping pass that gave him a license to camp in the overnight camping area. Fourth Amendment jurisprudence is clear that under these circumstances, the Defendant's tent structure itself, where he slept, along with any personal belongings kept therein,[10] was functioning as his temporary home for the four-day music festival and, thus, should be granted Fourth Amendment protection. See, e.g., United States v. Gooch, 6 F.3d 673, 676-77 (9th Cir. 1993).

The Defendant contends that his campsite qualifies as curtilage to his tent. The curtilage, or the area immediately surrounding and associated with a particular house, also is protected by our constitutions. Christensen, 517 S.W.3d at 69 (citing Jardines, 569 U.S. at 5; Talley, 307 S.W.3d at 729) (stating that article 1, section 7 of the Tennessee Constitution "protect[s] the curtilage, which is defined as any area adjacent to a residence in which an individual can reasonably expect privacy"); State v. Prier, 725 S.W.2d 667, 671 (Tenn. 1987) ("To make explicit what is unmistakably implicit in our cases and the federal cases, the curtilage is entitled to the same constitutional protection against ground entry and seizure as the home.")). At common law, curtilage consisted of "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." Oliver v. United States, 466 U.S. 170, 180 (1984) (internal quotation and citation omitted). Courts have since defined curtilage by reference to factors that "determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." Id.

In United States v. Dunn, the Supreme Court established four factors to consider in resolving questions of curtilage: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included in an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. 480 U.S. 294, 301 (1987). The Court stressed that these factors cannot be "mechanically applied," but are merely "useful analytical tools" to determine whether an area is to be protected from unconstitutional searches and seizures. Id. However, the curtilage analysis "does not necessarily carry over to most camping contexts." United States v. Basher, 629 F.3d 1161, 1169 (9th Cir. 2011).

---

[10] We do not find it necessary to determine whether the Defendant had a reasonable expectation of privacy in the easy-up canopy tent structure because none of the incriminating evidence came from therein.

In Basher, the Ninth Circuit Court analyzed questions regarding the existence of curtilage incident to a campsite. 629 F.3d at 1169. The officers arrived at the tent and verbally asked the defendant and his son to exit the tent. The officers did not enter the tent. In rejecting Basher's argument that the seizure occurred inside the curtilage of the campsite, the Ninth Circuit explained "[c]lassifying the area outside of a tent in a National Park or National Forest lands campsite as curtilage would be very problematic." Id. Unlike traditional homes, a tent located within a "dispersed, ill-defined" campsite is open to the public and exposed. Id.; see also People v. Nishi, 207 Cal. App. 4th 954, 962 (Cal. Dist. Ct. App. 2012) (distinguishing privacy of a tent "where people sleep and keep valuables" from the remainder of the "unauthorized, undeveloped campsite"). Further, "[w]hile [the Dunn] factors can be employed with reasonable certainty in the urban residential environment, the analysis does not necessarily carry over to most camping contexts. Parkland campsites often have layouts that are vague or dispersed, and individuals often camp in areas that are not predetermined campsites." Id. The Basher Court ultimately concluded:

> In the case at bar, Basher was staying in a dispersed, or undeveloped camping area. It appears that Basher's camp was visible from the developed camping area where the officers had stayed the previous night. Therefore, we hold that . . . the area outside of the tent in these circumstances is not curtilage.

Id.

Other courts have agreed with Basher's analysis, recognizing that "the dispersed or undeveloped nature" of the campsite does not underpin the Basher Court's rationale. State v. Beck, 336 P.3d 809, 814 (Idaho Ct. App. 2014). Thus, in a case where "anybody could pass through" a camp, and it was "not private," the Idaho Court of Appeals likewise held that there was no expectation of privacy in the campsite and that the area outside of a tent was not curtilage. Id.

The Defendant argues that Basher and Beck do not apply here because the defendants in those cases were camping on public land. The Defendant emphasizes that he was camping on "a plot assigned by a private entity—Bonnaroo" and indicates that his campsite "layout was not vague or undefined." We disagree.

This was a music festival often attended by over 90,000 people. The event and overnight camping area were open to the public for a fee. Here, the Defendant's car was parked in an open field, along with seemingly hundreds of other cars and campers. The reasoning of Basher and Beck apply despite the fact this was not publicly owned land. In addition, the Defendant offered no proof, other than his own testimony, regarding the 20-by-20 boundary or that his parking space was included in this boundary. Investigator

-15-

Sherrill provided only that each camper was given a "square" area to set up camp. The photographs provided by the Defendant at the hearing did not reflect any official boundaries or demarcation of the individual campsites. In fact, they reflect that these campsites were erected in closely confined areas; were immediately adjacent to each other, in fact, bumper-to-bumper as described by the Defendant and his sister; and were next to and almost visible to all who were nearby. The Defendant's campsite in this case was ill-defined and certainly open to the public and exposed similarly to those in Basher and Beck.

The Defendant also submits that the facts here are more akin to the recent ruling of the Supreme Court in Collins. The Defendant states, "Like the motorcycle in Collins, [his] car was, at the very least, parked in 'an area adjacent to the home and to which the activity of the home life extends.'" (Citing Collins, 138 S. Ct. at 1671). In Collins, the property that was subject to an illegal search was a stolen motorcycle. This stolen motorcycle was fully covered by a tarp and parked on the top of the driveway at Collins's girlfriend's home, but it was partially visible by investigating officers while they viewed the property from the street. The court found that the area where the motorcycle was parked was inside a partially enclosed top portion of the driveway that adjoined to the house and was therefore within the curtilage of the home. As such, the court held that "[t]he automobile exception does not permit the warrantless entry of a home or its curtilage in order to search a vehicle." Id. at 1668. Collins is clearly factually distinguishable from the present case.

Again, the Defendant's car was parked in an open field, and his ill-defined campsite was located in an area with hundreds of other overnight campers. It was exposed and visible by all passersby. Accordingly, the Defendant's campsite in this case is not curtilage for Fourth Amendment purposes.[11] Therefore, the officers' entry onto the campsite was not prohibited by the property-based analysis of Jardines.

Now we turn to the reasonable-expectations test of Katz because this analysis must be addressed separately from whether the car-camping sites at Bonnaroo are curtilage. See Christensen, 517 S.W.3d at 77. The Defendant contends that he "exhibited an actual (subjective) expectation of privacy in his campsite by exercising control over his assigned 20' x 20' space and setting up living quarters to reside there for several days." The Defendant again relies on property-based concepts for his assertion that his expectation of

_____

[11] That is not to say that the area around a tent could never be curtilage, but such is not the case here. See Kelley v. State, 245 S.E.2d 872 (Ga. Ct. App. 1978) (finding that four defendants who lived in tents and raised marijuana on property owned by the grandmother of two of the men had a legitimate expectation of privacy in the tents, and that the garden was a protected zone of privacy because it was within the curtilage surrounding the tents, so that the officers' warrantless intrusion into the clearing violated the defendants' rights under the Fourth Amendment).

privacy was reasonable. For the same reasons supporting our holding under the <u>Jardines</u> test, we hold that the Defendant has failed to satisfy the second prong of the reasonable-expectations test. <u>See</u> <u>Jardines</u>, 569 U.S. at 13-14 ("It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align. The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions." (Kagan, J., concurring) (quoting <u>Georgia v. Randolph</u>, 547 U.S. 103, 111 (2006))).

First, we note that the terms of the Defendant's ticket state, "Persons entering <u>the facility</u> are subject to search for contraband, alcohol, controlled substances, weapons, firearms, fireworks, cameras, video equipment or recording devices, which are expressly forbidden and subject to confiscation." (Emphasis added). We do not read this provision to limit search solely to the point of entry at the tollbooth. The overnight camping area in located on the 700-acre farm. Investigator Sherrill testified that concertgoers and campers "know they're subject to search once they come onto Bonnaroo grounds." He also testified that he had seen Bonnaroo security remove patrons for refusing to be searched.

Importantly, the car-camping sites were small, packed bumper-to-bumper, and fully exposed to public view. Other campers, security, and law enforcement were frequently walking through the area. The Defendant's vehicle was easily visible to anyone who passed. Again, there was no proof of defined boundaries for each campsite. Investigator Sherrill had worked the music festival annually and was on routine patrol along with five other officers when he overheard Mr. Watson trying to sell drugs, which ultimately led him to the Defendant. A reasonable member of society would not view any privacy expectation in the campsite under these circumstances as reasonable and justifiable. We note that the <u>Basher</u> Court also held that the defendant had no reasonable expectation of privacy in the campsite, relying on the same reasoning that supported its conclusion that the area outside of the defendant's campsite was not curtilage. <u>See</u> 629 F.3d at 1169. While the Defendant has a reasonable expectation in his sleeping tent, the reasonableness of the Defendant's privacy expectation cannot be said to encompass the whole campsite under the facts of this case. Accordingly, the officers did not violate the Defendant's federal or state constitutional rights against unreasonable searches when they entered his camping area.

Additionally, the trial court concluded that the search of the Defendant's vehicle fell with the automobile exception to the warrant requirement and that there was probable cause to believe that contraband was located inside the Defendant's vehicle. The Defendant does not challenge these findings of the trial court other than as they relate to the location of his vehicle on the campsite. The Defendant's certified question does not entitle him to relief.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE