Filed 4/3/24  P. v. Wright CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C096558 |
| Plaintiff and Respondent, | (Super. Ct. No. 21CF03982) |
| v. | |
| JEDIDIAH JAMES WRIGHT, | |
| Defendant and Appellant. | |

Defendant Jedidiah James Wright stabbed John S. during an altercation, killing him.  A jury found him guilty of second degree murder.  Defendant claims he was denied a fair trial when the court failed to properly instruct the jury and when his counsel failed to object to the prosecution's dilution of its standard of proof.  We agree the jury was improperly instructed as to the wrongful conduct portion of CALCRIM No. 571.  We also agree defendant was thereby prejudiced.  We shall therefore reverse the judgment and remand for a new trial.

1

# FACTUAL AND PROCEDURAL BACKGROUND

The following events occurred at Comanche Creek, a public greenway/park located along the side of a small river. Homeless encampments sit along both sides of the river, where about 80 people live in tents or structures. Each camp is separate, and residents often mark the boundaries of their encampments with makeshift fencing. It is customary for individuals to stay out of marked areas unless they occupy the area or are invited to enter the area. There is a dirt pathway through the greenway for travel; police officers use the path to patrol the area in patrol cars, on bicycle, or on foot.

At the time of the incident, Amber B. lived in a trailer in the Comanche Creek parking lot. She had known John for about a year. On July 31, 2021, there was a fight between John's girlfriend, Amanda T.,[1] and another woman named Beth. According to Amber, John stopped them from fighting. A man named DJ was present for that fight.

DJ lived in a different area of Comanche Creek, next to defendant. On August 1, defendant saw DJ with a black eye, bruised face, and other injuries. DJ told defendant that a man named John injured him in an incident connected to the fight between Amanda and Beth the day prior. DJ accompanied defendant as defendant investigated DJ's story and discovered where John was camped. Defendant told DJ that he would confront John but needed to use heroin first. Later, on his way to work, defendant walked over to John's campsite.

*Eyewitness testimony about the altercation*

A police officer interviewed Amanda at the scene and recorded the interview on his body-worn camera. Amanda told the officer that her boyfriend John was stabbed. She reported that she and John were hugging and kissing near his tent when she saw a tall, skinny man approach and stab John in the chest with a knife. John then picked

---

[1]    Also known as Amanda S.

2

something up from the ground and chased the man before collapsing. The jury viewed the body camera interview with Amanda.

Tammy T. also lived at Comanche Creek. When the stabbing happened, she was in a different campsite, about 25 to 30 feet away from John's campsite. She saw Amanda (her niece) screaming and John and another man "going around" a tree. John had a metal pipe or stick in his hand and was chasing the man and screaming.[2] The other man rounded the tree, went around a shopping cart that was at the edge of John's campsite, and then down the path toward the parking lot.

Tammy turned away to get groceries from her trunk. When she turned back, she saw John take a few steps then fall over on his face.

Amber was sitting across from John's camp, busy on her phone, when she heard a commotion. She looked up and saw defendant approach John and ask him if he was John. At this point, defendant was on the pathway to the side of John's camp; he and John walked toward each other. Defendant and John went "back and forth," "about to fight." Amber saw John turn to grab something. Amber could not see whether John had anything in his hand because she was not wearing her glasses. Defendant swung at John, hitting him. John grabbed a pole or stick of some sort and tried to give chase before he collapsed. At this point, Amber saw Amanda come out of the tent. The other man walked quickly toward the front entrance of the campground.

*Defendant's account of the altercation*

When defendant was arrested, he told officers "it was self-defense." His videotaped interview with detectives was viewed by the jury. Defendant also testified at trial.

---

[2]    Tammy testified that she showed the police the pipe. Chico Police Officer Daniel Wilson testified there were several pipes in a general vicinity of John.

3

In his interview, he explained he was friends with DJ. On the day of the stabbing, DJ told defendant of an encounter DJ had with John the day prior. According to defendant, DJ said that he told Amanda she was rude. John, who was Amanda's boyfriend, ran up behind DJ and sucker punched him, knocking him to the ground, and then kicked him. Defendant noticed that DJ had a black eye and a scrape on his (bald) head and was reportedly suffering from a concussion. Although defendant was not aware of DJ ever lying to him, defendant wanted to investigate for himself. When he did so, others told him a similar story.

Defendant was mad about what was done to DJ, but not furious. Defendant heard John had been drinking at the time of his altercation with DJ and understood that drinking can make people do things normally out of character. Although DJ hinted that defendant should take care of it, defendant did not tell DJ that he would do anything. He said, "Wait until I get well," meaning wait until he used heroin, and he would go confront John. At the same time, defendant was afraid of DJ's gang affiliations.

Aside from DJ's story, defendant knew nothing about John. DJ showed defendant where John's camp was located. Defendant did not see John and he returned to his own camp.

Later that day, defendant walked to John's camp to talk to him about his interaction with DJ. He hoped to find out what happened and to get John's side of the story. Defendant was not planning on fighting John. Defendant did not consider himself as a fighter; he was on his way to work and had no plans to get in a fight. He wanted to tell John that he messed up and that people in the area were upset with him about what he did to DJ. In the back of defendant's mind, however, he realized there was a possibility that there could be a fight if John became violent. Defendant stated he did not focus on that possibility.

4

Defendant said he always carried a small pocketknife for self-defense. On this day, it was partially folded in his back pocket. He sometimes carried the knife in this manner so he could use it quickly if necessary.

Defendant approached John's camp while smoking a cigarette. A girl standing nearby asked him what he wanted. Defendant said he was looking for John and asked if he was there. John stepped forward and identified himself. Defendant and John walked around obstructions toward each other. Defendant asked, "Can we talk?" Defendant denied any aggression on his part; he stated he displayed a nice and polite, nonconfrontational demeanor. He was not squared to fight. He was holding a cigarette in his left hand and had his right hand in his rear pocket just in case John wanted to fight.

John did not verbally respond. He hiked up his trousers and then appeared to pull a black object from his front pants pocket. Defendant feared that it could be a weapon but was not 100 percent sure that John had a weapon. John threw a "haymaker" punch aimed at defendant's face, but defendant dodged it. Defendant pulled the knife from his back pocket and opened it with one hand. John threw a second punch, like a jab, but it did not connect either. Defendant, holding the knife with the blade facing forward, jabbed John in the chest.

John took another swing that missed before he realized that he had been stabbed. When he saw that he was bleeding, he said, "son of a bitch," and then ran to grab a metal object that looked like a pipe or metal bar. Defendant walked away and started running when John tried to chase after him.

Defendant stated that the stabbing happened quickly; it was a "fight or flight" reaction. He was not thinking of different ways he could have responded once John started swinging. He did not intend to kill John. He said he only wanted to stop John's attack and, at most, hurt him. Afterward, he was pumped with adrenaline and freaking out in a daze because he had never used his knife before. While he was freaking out, he threw the knife away.

5

At trial, defendant testified in a manner consistent with his videotaped interview, providing some additional details we will recount here. Defendant testified that he was skeptical of DJ's story; DJ was an acquaintance and defendant did not believe everything DJ said. Defendant was worried that the conflict between John and DJ would invade his camp because he was DJ's neighbor, and someone might believe defendant "was involved with DJ." Defendant was more concerned for himself than for DJ.

Later that day, defendant walked to catch the last bus available for work. On the way, he decided to stop by John's campsite to "squash the beef" between DJ and John. Defendant testified that he only wanted to talk to John and did not intend a confrontation. From the path near John's site, defendant asked John if they could talk. Defendant and John approached each other and, when John was close, he pulled an object out of his pocket and swung at defendant. Defendant also stated he "was a little bit scared." Defendant dodged the punch and pulled his half-open pocketknife from his back pocket as John was taking another swing at him. Defendant was able to dodge that punch too and then swung his knife wildly at John. He thought it would hit John in the abdomen but stabbed him higher than he intended.

Defendant stood there, wondering if John was okay. John grabbed a pole and started to chase him. Defendant ran away.

*Arrest, charges, and trial*

Three men followed defendant out of the encampment to the market. One of his pursuers said he wanted to talk to defendant and defendant threw his knife into a grassy area so the man would know that defendant was not going to use it. One of the men asked him for his name and took a photo of him. Police arrived to arrest him. He volunteered that "it was self-defense." Defendant was cooperative and told police where he threw the knife. Officers found a folded pocketknife that was approximately 2.5 inches in length when closed, with apparent blood on it. When he was arrested, defendant inquired about John's status, and he broke down in tears when detectives later

6

informed him that John had died. He said that he never intended for anyone to die. Defendant stated that when he told the detectives that he intended to hurt John, it was not true.

Defendant was charged with murder in violation of Penal Code section 187, subdivision (a).[3] It was also alleged that he used a deadly weapon, a knife, within the meaning of section 12022, subdivision (b)(1). Following a jury trial, defendant was convicted of second degree murder. The jury found true the deadly weapon allegation. Defendant was subsequently sentenced to a term of 15 years to life with a one-year enhancement for his use of a deadly weapon.

**DISCUSSION**

I

*The Jury Instruction on Wrongful Conduct Precluded Consideration of Self-Defense*

Defendant claims the court prejudicially erred by instructing the jury on the "wrongful conduct" portion of CALCRIM No. 571. He claims the instruction misstated the law by failing to specify that the right to assert imperfect self-defense is lost by engaging in *illegal* conduct that *legally* justifies an adversary's use of force. He also argues that there was not substantial evidence that he committed the sort of wrongful conduct that would preclude imperfect self-defense. He argues the error was prejudicial because the instruction prevented the jury from considering his claim of imperfect self-defense. We agree.

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are

---

[3] Further undesignated statutory references are to the Penal Code.

7

necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154, disapproved on another ground in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.) This instructional duty "prevents the 'strategy, ignorance, or mistakes' of *either* party from presenting the jury with an 'unwarranted all-or-nothing choice,' encourages 'a verdict . . . no harsher *or more lenient* than the evidence merits' [citation], and thus protects the jury's 'truth-ascertainment function' [citation]." (*Breverman, supra*, at p. 155.)

The People initially claim that defendant forfeited his challenge to the instruction by failing to object to the instruction or, alternatively, the instruction is supported by substantial evidence. It is true defendant did not object to the instruction. " '[A] defendant need not assert an objection to preserve a contention of instructional error when the error affects the defendant's "substantial rights." [Citation.] In this regard, "[t]he cases equate 'substantial rights' with reversible error" under the test stated in *People v. Watson* (1956) 46 Cal.2d 818. [Citation.]' [Citations.] 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim . . . .' " (*People v. Lawrence* (2009) 177 Cal.App.4th 547, 553-554, fn. 11; see also *People v. Jimenez* (2016) 246 Cal.App.4th 726, 730.) Therefore, we turn to the merits of defendant's claim to determine whether instructional error affected his substantial rights. (See § 1259.)[4]

We review de novo whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) We also independently review whether an instruction

---

[4]    Section 1259 provides, in relevant part, that an appellate court "may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (§ 1259.)

effectively directs an adverse finding to the defendant by removing an issue from the consideration of the jury.  (*Ibid*.)

*A.  Additional background*

Prior to trial, the prosecutor's motion in limine outlined the basis for claiming that defendant was not entitled to argue self-defense due to his own wrongful conduct.  The prosecutor argued that "self-defense is not available to a defendant who creates circumstances which justify the victim in attacking or pursuing the defendant.  Even if defendant's version of events is believed, it was defendant who went to [John]'s campsite to confront him about a prior altercation, traveling 15-20 minutes from the back of the camp to do so.  This is akin to going to someone else's home to start a fight.  [John] had the right to eject a trespasser and had the right to escalate the violence as the circumstances warrant it.  [Defendant] created the circumstances that ultimately led to the belief that he had to defend himself.  This bars [defendant] from using the affirmative defense in this matter, as outlined above."

With respect to imperfect self-defense, the prosecutor argued in her motion in limine, "the imperfect self-defense theory does not apply when, as with 'perfect' self-defense, the defendant through his or her own wrongful conduct creates the circumstances under which the victim is legally justified in attacking or pursuing the defendant."  After briefly arguing the facts did not support the imperfect self-defense instructions, the prosecutor continued, "and most importantly, defendant created the circumstance in which the alleged altercation occurred prior to the stabbing.  [Defendant] admittedly went to [John]'s camp, which was for all intents and purposes [John]'s home.  [Defendant] and [DJ] had previously been seen in the area scoping the camp out.  [Defendant] had also inquired of other individuals in the camp as to where [John] lived.  The circumstances were manufactured entirely by [defendant]'s own conduct and, as stated above, because of this imperfect self-defense does not apply."  The court deferred

9

ruling on this issue, opting to wait to see whether the evidence supported instructions on self-defense.

Prior to closing arguments, the trial court and counsel met outside the presence of the jury and discussed the applicable jury instructions. During this jury instruction conference, the prosecutor objected to instructing the jury on imperfect self-defense, referencing her motion in limine. She argued that defendant created the circumstances that justified John's use of force, so could not avail himself of imperfect self-defense. Defense counsel disagreed that defendant created the situation, arguing the evidence showed John reached for a weapon and swung at defendant prior to defendant stabbing John. The court found there was substantial evidence to merit the jury's consideration of voluntary manslaughter based on imperfect self-defense. The prosecutor did not request any additional instructions regarding self-defense.[5]

The jury was instructed on justifiable homicide due to self-defense and voluntary manslaughter based on imperfect self-defense. (CALCRIM Nos. 505, 571, respectively.) The imperfect self-defense instruction under CALCRIM No. 571 included optional, bracketed language that told the jury "[i]mperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force."

During closing argument, the prosecutor discussed first degree murder and argued that defendant made a series of choices that reflected premeditation and deliberation. She began by arguing, "defendant took a path to murder this day. [¶] . . . [T]he evidence shows there was a series of steps that needed to happen in order for murder to occur.

---

[5]     Other instructions addressing self-defense generally include:  right to self-defense: mutual combat or initial aggressor (CALCRIM No. 3471); right to self-defense: may not be contrived (CALCRIM No. 3472); and right to eject trespasser from real property (CALCRIM No. 3475).

10

Each of those steps was a decision or a choice. Each decision and choice shows thought, and thought is premeditation and deliberation." The prosecutor then outlined some of those steps, including when defendant "scoped out the location and gathered information," "gathered a killing tool," and "traveled to the location." The prosecutor continued: "[H]e arrived at [John]'s camp and decided to kill. [¶] He created the circumstances that allowed him to use the weapon." The prosecutor argued that when defendant approached John, he did not indicate he was not interested in a confrontation but instead approached "Hand in the back pocket, smoking a cigarette. 'Are you John?' [¶] It's a much different nonverbal communication that occurred when he entered the home of [John]. [¶] After he confirmed it was [John] he was talking to, he acted quickly and he struck decidedly. [¶] This is John [S.]'s home. The location of the crime itself is indicative of premeditation and deliberation. There is a reasonable expectation of privacy in your home regardless of what it looks like. [¶] And in Comanche Creek, you didn't just go into a person's personal campsite unannounced. They built walls. They had rules because these spaces, albeit modest and small, were where people lived. [¶] Law enforcement gets search warrants to go into these if they need to find evidence of a crime. [¶] And the people at Comanche Creek respected the privacy of others. [¶] Defendant set up the circumstances where John [S.] would feel threatened. He spent the afternoon asking about him. Defendant approached him with his hand in the back pocket. And when defendant asked if he was John, the defendant took action. [¶] What happened after the killing is also important in determining premeditation and deliberation."

In discussing defendant's claim of self-defense, the prosecutor argued that defendant's belief he was in imminent danger was not reasonable because, "getting punched in the face is not death or great bodily injury. . . . [¶] The defendant also did not need to use deadly force to defend against that punch. [¶] . . . 'A punch for a punch, a stab for a stab.' [¶] Someone swinging at you doesn't mean you stab them. And that is what is reasonable. Especially in light of the fact that the defendant was the one that

11

went into John's campsite to confront him. Defendant was in John's home on John's turf. Defendant created the circumstances. [¶] . . . [¶] . . . The issue is defendant's conduct, with defendant's conduct is that he didn't even have to initiate this event at all." The prosecutor continued by arguing that just because defendant claimed it was self-defense does not mean it's true. "First and foremost, in order to even get here, the defendant would have—would not have been able to create the circumstances justifying this behavior. What we have here is the defendant, through his own wrongful conduct, created circumstances that justified his adversary's use of force. [¶] Voluntary manslaughter doesn't even apply here because the defendant created the circumstances where, even if you believe John [S.] threw the first punch, defendant created it. He's the one that decided that he was going to go to that campground with a knife, he was going to confront him after spending the day asking questions about him."

### B. Analysis

Whether a defendant seeks to invoke the "ordinary self-defense doctrine— applicable when a defendant reasonably believes that his safety is endangered"—or the "imperfect" variant of the doctrine—applicable when the defendant actually but unreasonably holds the belief—the defendant cannot succeed if, "through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony)," defendant "has created circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1, italics omitted; see *People v. Rangel* (2016) 62 Cal.4th 1192, 1226.) However, the defense *is* available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant. (*People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179-1180; *People v. Frandsen* (2011) 196 Cal.App.4th 266, 273.)

Defendant claims that the language in CALCRIM No. 571 misstated the law because it failed to inform the jury that defendant must engage in *illegal* conduct that, in

12

turn, *legally* justifies an adversary's use of force.  The People respond that the inclusion of the relevant paragraph in the voluntary manslaughter instruction "merely restated" language that was approved in other cases.  We agree that the instruction alone is a correct statement of law, when warranted by the facts.  "Wrongful conduct" has no technical legal definition.  In *In re Christian S., supra*, 7 Cal.4th 768, the court observed: "It is well established that the ordinary self-defense doctrine—applicable when a defendant reasonably believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified.  [Citations.]  It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances." (*Id*. at p. 773, fn. 1.)  But this footnote merely signifies that assaults and felonies are examples of conduct that give rise to the wrongful conduct limitation—not an exclusive and technical definition of wrongful conduct.  The jury instruction correctly, albeit generally, reflects that the limitation applies to a defendant whose conduct has created circumstances that justify his adversary's use of force.  (See CALCRIM No. 571.)

Moreover, a reasonable juror would understand that the term "justify" in this context means "legally justify," particularly since the jury was instructed that "[i]f a person kills with a legally valid excuse or justification, the killing is lawful and he or she has not committed a crime." (CALCRIM No. 500.)  Similarly, the word "justify" means "legally justify" in CALCRIM No. 505, which instructs that "[t]he defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense." (See *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 [" ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given" ' "].)  In short, a reasonable juror would have understood CALCRIM No. 571 as precluding the

13

application of the imperfect self-defense doctrine only if defendant committed wrongful conduct that legally justified John's use of force.

Nevertheless, to avoid instructional error, the instruction must be supported by substantial evidence. To determine whether the instruction was warranted in this case, we first identify the wrongful conduct relied upon as warranting the instruction. On appeal, the People argue that the instruction was warranted because there was substantial evidence that defendant was the initial aggressor. Contrary to the People's claim, the trial prosecutor did not advance a theory of wrongful conduct identifying defendant as the initial aggressor.[6] A review of the prosecutor's argument reveals that she never tied the wrongful conduct instruction to the evidence suggesting defendant immediately stabbed John. Nor did the prosecutor seek a correlative special jury instruction such as CALCRIM No. 3471 (initial aggressor) or CALCRIM No. 3472 (contrived self-defense). Rather, we view the prosecutor's argument as characterizing defendant's conduct of approaching John's campsite to confront him about a prior altercation, not only as constituting the act that demonstrated his state of mind for first degree murder, but also constituting the "wrongful conduct" supporting the giving of the optional language contained in CALCRIM No. 571.

Specifically, the prosecutor argued that defendant deliberately planned his encounter with John by finding John's campsite, then arming himself and going to confront John. She argued that when defendant confirmed he was speaking to John, "he struck decidedly." While that last statement could be a comment referencing defendant as the initial aggressor, the prosecutor did not maintain that argument. She proceeded to

---

[6] On appeal, the People do not argue that John had a right to eject defendant as a trespasser, abandoning the trial prosecutor's argument raised in her motion in limine. To the extent the prosecutor's closing argument may be read as such, there was no evidence that John ever requested defendant leave the area prior to the altercation.

14

argue that the location of the crime—John's "home"—was indicative of defendant's premeditation and deliberation for two reasons. First, the social customs of the encampment precluded going into another's campsite without an invitation. Second, the prosecutor implied that a visitor had no legal right to enter another's campsite without permission because even "[l]aw enforcement gets search warrants to go into these if they need to find evidence of a crime." She argued, in light of defendant's violation of the above two conditions, that by approaching the campsite, "[d]efendant set up the circumstances where John [S.] would feel threatened."

The prosecutor then doubled down on defendant's approach to the campsite as wrongful conduct that precluded self-defense. Acknowledging the evidence suggested John was the initial aggressor, she argued: "Someone swinging at you doesn't mean you stab them. . . . Especially in light of the fact that the defendant was the one that went into John's campsite to confront him. Defendant was in John's home on John's turf. Defendant created the circumstances. [¶] . . . [¶] . . . The issue is defendant's conduct, with defendant's conduct is that he didn't even have to initiate this event at all." The prosecutor argued that defendant could not claim self-defense because "[w]hat we have here is the defendant, through his own wrongful conduct, created circumstances . . . . [¶] . . . where, even if you believe John [S.] threw the first punch, defendant created it. He's the one that decided that he was going to go to that campground with a knife, he was going to confront him after spending the day asking questions about him."

To constitute wrongful conduct sufficient to preclude self-defense, the acts themselves must legally justify a victim's forceful response. (*People v. Enraca* (2012) 53 Cal.4th 735, 761 [the self-defense doctrine may not be invoked by a defendant who, through his own wrongful conduct, has created circumstances under which his adversary's attack or pursuit is legally justified].) Upon close examination of the conduct upon which the prosecutor focused, we find the conduct does not meet that threshold. First, even if defendant's approach violated the social customs of that encampment, as the

15

prosecutor argued, we conclude it does not rise to the type of conduct that would legally justify John's use of force. Additionally, the prosecutor's argument that it was unlawful for defendant to approach John's campsite (thereby justifying John's use of force) because even law enforcement would need a warrant to enter a campsite on public land, is not tethered in the law. (See, e.g., *People v. Nishi* (2012) 207 Cal.App.4th 954, 961-963 [distinguishing between a tent as a private area and the exposed open-to-public-view campsite area; finding no reasonable expectation of privacy in campsite located illegally on public land]; *U.S. v. Basher* (9th Cir. 2011) 629 F.3d 1161, 1169 [distinguishing between a tent and campsites, stating that classifying the area outside of a tent on public lands as curtilage "would be very problematic"].) Put simply, we are aware of no authority prohibiting a person from approaching another's campsite on public land, under circumstances as defendant did here, such that it would legally justify a victim's forceful response. (Cf. *Davis v. U.S.* (9th Cir. 1964) 327 F.2d 301, 303 ["Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law"].)

The problem as we've identified it, is that the conduct relied on by the prosecutor, namely the circumstances and manner under which defendant approached John in his campsite, does not amount to the type of wrongful conduct that would have legally justified John's use of force. As used in this manner, the instruction was not supported by substantial evidence. By claiming that defendant's approach to John's campsite amounted to wrongful conduct and that pursuant to the instruction defendant could not claim self-defense, the prosecutor and the trial court misstated the law and misled the jury. (See *People v. Fiu* (2008) 165 Cal.App.4th 360, 370 [a court is required to instruct

16

on the law applicable to the case; the instructions must be complete and a correct statement of the law].)

We find support for our conclusions in the analogous case of *People v. Ramirez* (2015) 233 Cal.App.4th 940. In that case, the defendants sought out rival gang members for a fight. (*Id.* at p. 944.) A fight broke out, and one of the rival gang members raised his hand, holding an object that looked like a gun. (*Id.* at p. 945.) One of the defendants pulled a gun from his pocket and shot the rival gang member. (*Ibid.*) The trial court instructed the jury on mutual combat and contrived self-defense using CALCRIM Nos. 3471 and 3472, respectively. (*Ramirez*, at pp. 945-946.) In closing argument, the prosecutor invoked CALCRIM No. 3472 and misstated the law regarding self-defense, arguing that a defendant's intent to provoke a fight of any kind barred any self-defense claim. (*Ramirez*, at pp. 943, 946-949.) The *Ramirez* court found that CALCRIM No. 3472 in conjunction with the prosecutor's argument deprived the defendants of their self-defense theory because if the defendants intended to start a nonlethal fight, they still had the right to defend themselves when the victims responded with lethal force. (*Ramirez*, at pp. 947-948.) *Ramirez* stressed the importance of defining the relevant parameters within which the self-defense theory may be considered by the jury.

Here, analogous to the situation in *Ramirez*, the prosecutor's argument coupled with the instruction deprived defendant of his self-defense theory. It was the prosecution's burden to prove defendant's state of mind during the killing. (*In re Walker* (2007) 147 Cal.App.4th 533, 552 [upon a charge of murder, if evidence of self-defense has been presented, it is the People's burden to prove beyond a reasonable doubt the defendant committed murder rather than voluntary manslaughter].) As part of the deliberation process, the jury was required to consider whether defendant's approach to John's campsite constituted proof of defendant's intent to kill him or, whether defendant's intent was as he claimed: To find out what happened, then quickly believing the need to defend himself against John's use of force. (See § 20; *In re Jorge M.* (2000)

17

23 Cal.4th 866, 872 [criminal liability is established by linking the relevant state of mind and acts].) By telling the jury that defendant's approach was sufficiently wrongful to preclude self-defense, when the approach itself did not legally justify John's use of force, the instruction as used by the prosecutor misstated the law and improperly removed defendant's theory of self-defense from the jury's consideration.

If a defense theory, such as self-defense or imperfect self-defense, that operates to negate an element of the charged offense is introduced, the due process clause requires the prosecution to prove the absence of that circumstance beyond a reasonable doubt. (*People v. Schuller, supra*, 15 Cal.5th at p. 260.) When the instructions on that theory preclude the jury from making a factual finding that is necessary to prove the malice element of murder, the error amounts to a violation of the federal Constitution and is subject to *Chapman*'s " 'beyond a reasonable doubt' " standard for evaluating prejudice. (*Schuller*, at p. 260, citing *Chapman v. California* (1967) 386 U.S. 18.) This test is exacting, "requiring reversal unless the reviewing court is persuaded that ' " '[n]o reasonable jury' " would have found in favor of the defendant on the missing fact, given the jury's actual verdict and the state of the evidence.' " (*Schuller*, at p. 261.) In reviewing the record, if " 'the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless.' " (*Ibid*.)

Under the facts of the case, we cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error.

First, the wrongful conduct is not obvious from the evidence received by the jury, and the instructions, as a whole, did nothing to identify or explain that wrongful conduct, only the People's argument did that. While we are normally reminded that jurors are instructed, as they were in this case, that what the attorneys say is not evidence, and we trust jurors to follow the law, that admonition only goes so far when the prosecutor

18

misstates the law. (See, e.g., *People v. Collins* (2021) 65 Cal.App.5th 333, 340.) Contrary to the People's claim, we see no chance the jury would simply disregard the wrongful conduct instruction as inapplicable, because the prosecutor's argument highlighted the instruction and purported to inform the jury that defendant's approach to the campsite constituted the very type of wrongful conduct that precluded consideration of self-defense. Again, this was the only guidance the jury received on how to apply this instruction.

Second, the instruction coupled with the prosecutor's argument informed the jury that defendant's conduct in approaching John's campsite "created circumstances which gave rise" to John's use of force and defendant could not avail himself of his theory of self-defense. Under these circumstances, the jury could have rejected any claim of self-defense even if it found that defendant was not an initial aggressor and defendant actually believed he needed to stab John to defend himself against imminent peril.

Finally, if the theory of self-defense had not been precluded by the instruction coupled with the prosecutor's argument, there exists sufficient evidence to support a finding contrary to second degree murder. Defendant contested the element of malice and provided evidence that he killed John in self-defense. If the jury believed defendant's version of events, a different verdict was possible. (See *People v. Soojian* (2010) 190 Cal.App.4th 491, 521 ["a hung jury is a more favorable result than a guilty verdict"].) We conclude the "wrongful conduct" instruction was improper and defendant is entitled to a new trial.

## II

### *Remaining Issues*

Given our conclusion, we need not address defendant's arguments that: (1) the trial court improperly failed to instruct the jury on the lesser included offense of voluntary manslaughter based on sudden quarrel or heat of passion; (2) trial counsel was ineffective for failing to object to the prosecutor misstatement and minimization of the

19

burden of proof; and (3) the trial court erred in instructing the jury on adoptive

admissions based on his interview with detectives.

**DISPOSITION**

The judgment and sentence are reversed.  The matter is remanded for a new trial.


                                              _____/s/_____
                                              EARL, P. J.



We concur:



_____/s/_____
HULL, J.



_____/s/_____
WISEMAN, J.*


_____

\*      Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned
by the Chief Justice pursuant to article VI, section 6 of the California Constitution.